**Paul A. ZEIGLER, Plaintiff, Appellant,**

v.

**William T. CALLAHAN, Defendant, Appellee.**

No. 81–1015.

United States Court of Appeals, First Circuit.

Argued June 4, 1981.

Decided Sept. 22, 1981.

Harvey R. Peters, Boston, Mass., with whom Paul T. Smith and Jeffrey M. Smith, Boston, Mass., were on brief, for plaintiff-appellant.

Joseph P. Gordon, Jr., Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Stephen R. Delinsky, Asst. Atty. Gen., Chief, Crim. Bureau, Boston, Mass., were on brief, for defendant-appellee.

Before CAMPBELL, Circuit Judge, BOWNES, Circuit Judge, MAZZONE,* District Judge.

MAZZONE, District Judge.

### I.

During the early morning hours on Sunday, December 7, 1975, a fire occurred in a building at 62 Louis Prang Street in Boston. The building was owned by the petitioner and his business associate, David Siersdale. A twenty year old Boston University student died as a result of third degree burns sustained during the fire. Zeigler was indicted for murder in the second degree, arson, and arson with intent to defraud an insurance company. He was convicted of manslaughter, arson, and arson to defraud.

Petitioner subsequently moved for a new trial and, following evidentiary hearings, the motion was denied. *See Commonwealth v. Zeigler*, Nos. 014563–65, *Findings of Fact and Rulings of Law on Defendant's Motion for a New Trial*, (April 25, 1977) ("Findings and Rulings"). The Massachusetts Appeals Court affirmed both the convictions and the denial of Zeigler's motion for a new trial. *Commonwealth v. Zeigler*, —— Mass.App. ——, 80 Mass.App.Ct.Adv.Sh. 119, 399 N.E.2d 47 (1980). The Massachusetts Supreme Judicial Court denied Zeigler's application for further appellate review. Thereafter Zeigler filed the instant petition for *habeas corpus* relief under 28 U.S.C. § 2254. The district court denied his application and this appeal followed.

The petitioner relies upon three general grounds to support his argument that his convictions were obtained in violation of his constitutional rights: (1) the Commonwealth's alleged non-disclosure of part of an agreement with George Lincoln, a government witness, and its subsequent failure to "correct" Lincoln's allegedly false testimony concerning the agreement; (2) the Commonwealth's failure to disclose allegedly exculpatory evidence including prior statements by Lincoln, a psychological profile of Lincoln written some 9 years prior to Zeigler's trial, and the grand jury testimony of James DeFuria, a former member of the state police arson squad who did not testify at petitioner's trial; and (3) the admission into evidence of a stipulation that, had he been called to testify, DeFuria would have invoked his Fifth Amendment right against self-incrimination and refused to answer questions.

A proper evaluation of petitioner's allegations of constitutional violations and their probable effect, if any, on the jury's verdict, requires us to examine the record of the trial in detail.

### II.

The Commonwealth's theory of the case was that Zeigler and Siersdale, who together owned nearly 35 parcels of real estate in the Boston area, were under mounting financial pressure during the latter part of 1975, and that Zeigler procured the burning

of 62 Louis Prang Street in order to alleviate some of that pressure.

The undisputed evidence indicated that S & Z Realty, the name under which Zeigler and his partner operated, was indeed experiencing severe cash-flow problems during the summer and fall of 1975. During that time, Zeigler and Siersdale decided to stop paying certain debts, such as mortgage payments and insurance premiums. Robert S. Mirabito, an insurance agent, testified that he cancelled the fire insurance policy covering 62 Louis Prang Street on November 20, 1975 for non-payment of premiums.

Shortly thereafter, the South Boston Savings Bank, which held a first mortgage on the property in the amount of $40,000, paid the insurance premium and the policy was reinstated. Mirabito testified that he sent notices of the reinstatement to all interested parties, including Zeigler and Siersdale, by regular mail on November 25, 1975.

Nicholas Shaheen testified that he was the real estate broker who arranged for the purchase of the 62 Louis Prang Street property by Siersdale and Zeigler from South Boston Savings in 1974. Shaheen was also an insurance broker who, through Mirabito, had procured the original fire insurance policy on the 62 Louis Prang Street property.

Shaheen acknowledged that he had previously been convicted and was presently serving a 15 to 20 year sentence on unrelated arson charges. He also admitted that he had been indicted together with Zeigler and had recently pleaded guilty to arson and related charges involving 62 Louis Prang Street. He testified that, in exchange for his cooperation in the Zeigler case, the Commonwealth had agreed to recommend a sentence of 8 to 12 years on those charges to be served on and after his present sentence.

Shaheen testified that it was he who instructed Mirabito to cancel the fire insurance policy on 62 Louis Prang Street. Upon receiving notice of the reinstatement, however, he testified that he sent a copy of the notice to Siersdale and Zeigler, and specifically informed Zeigler by telephone of the reinstatement.

Shaheen stated that during the latter part of fall 1975, Zeigler told him he was having financial problems with several buildings in the City of Boston, including 62 Louis Prang Street. Specifically, Zeigler mentioned non-payment of rent and a lot of pimping and prostitution going on at 62 Louis Prang Street, and wanted to know whether there was a way that the building could be burned. Shaheen testified that he introduced Zeigler to George Lincoln, a contract arsonist with whom Shaheen had dealt in the past. According to Shaheen, the three met in a lounge in the South End and discussed the transaction. In response to a price of $8,000 mentioned by Lincoln, Zeigler indicated he would have to talk to his partner and get "the okay." Shaheen testified that, prior to meeting with Zeigler he had spoken with Lincoln and indicated that he wanted a $3,000 fee for his services in bringing Lincoln and Zeigler together.

Shaheen testified that he spoke with Zeigler by phone after the meeting, and asked whether Zeigler was satisfied with the price. Zeigler said he was not satisfied and could get someone else to do the job. After speaking briefly with Zeigler, Lincoln reportedly accused Shaheen of being "greedy," and of losing the job for him.

Shaheen next testified that after the fire Zeigler told him the arson squad had been to see him and he had a problem because there had been a death. Zeigler allegedly went to Shaheen's office, said he was disturbed because he'd set the fire, and asked whether Shaheen could put him together with Lieutenant James DeFuria of the Boston arson squad. Shaheen claimed he told Zeigler that DeFuria would try to scare him, but that he simply wanted to get paid for his services in "taking care of" the report on the fire. Zeigler asked how much DeFuria would charge and Shaheen said he told Zeigler it was between him and DeFuria.

Shaheen testified that he had another meeting with Zeigler at which they discussed the insurance policy on 62 Louis Prang Street and Shaheen furnished a proof of loss statement. A completed state-

ment, signed by Zeigler and Siersdale, was identified by Shaheen as the one he had furnished Zeigler and received into evidence as an exhibit. Shaheen stated that after this meeting he again met Zeigler in the South End and Zeigler said he was happy because DeFuria was whitewashing the death at 62 Louis Prang Street. Finally, Shaheen testified that he had a conversation with George Lincoln after the fire in which Lincoln said he had not started the fire at 62 Louis Prang Street.

On cross-examination, Shaheen was questioned at length about his involvement in an arson and manslaughter at 45 or 48 Milford Street, and the fact that he was presently serving a 15 to 20 year sentence. He was also asked about his agreement with the Commonwealth and about his previous dealings with George Lincoln, the contract arsonist. Defense counsel elicited the fact that Shaheen had received a commission on the sale of 62 Louis Prang Street to Zeigler, that he had received a commission when he obtained fire insurance for the property, and that he unsuccessfully tried to get a commission for arranging the arson at 62 Louis Prang Street.

Shaheen denied having a conversation several weeks after the fire in which Zeigler told him that there was no insurance on the property at the time of the fire and asked him to backdate a binder for insurance so that the loss would be covered. Shaheen then repeated that he had informed Zeigler by phone and by mail about the reinstatement of the policy.

Shaheen admitted having lied to a grand jury about whether he had solicited Lincoln to burn the property at 62 Louis Prang Street, and about whether he had put Lincoln in touch with Zeigler.

Shaheen was followed by George Lincoln. Lincoln described himself, among other things, as a "contract arsonist," i. e., a person who burned buildings for pay. Lincoln stated that he was testifying pursuant to an agreement with the Commonwealth. He described his understanding of the agreement, which is reported in the trial transcript as follows:

Their agreement is that if I would reveal to the Attorney General truthful information concerning all criminal matters in which I've been involved and if I would testify truthfully according to all criminal matters in which I've been involved, that the indictments which were procured from the grand jury of Suffolk County, and perhaps other counties in the Commonwealth, that the Attorney General, upon disposition of seventeen indictments pending against me for arson and fraud, would recommend to the Court that because of my cooperation, I would not be sent to any penal institution and that I should not be incarcerated; and, further, that if the Court saw fit to release me to society, that I would be allowed to leave the Commonwealth of Massachusetts and would be assisted in changing my name and the names of my children and establishing residence in [sic] business in some other part of the nation.

Lincoln testified about his prior relationship with Shaheen, indicating that Shaheen had acted as a real estate broker for him and as a middleman in connection with various arson contracts. Lincoln stated that he had burned many buildings for Shaheen and that Shaheen made money on the arson contracts.

Lincoln stated that he met Shaheen in October or November of 1975 and discussed the possibility of burning 62 Louis Prang Street. According to Lincoln, Shaheen told him Siersdale and Zeigler had purchased the property from South Boston Savings and were interested in burning it for the insurance. Lincoln testified that he met with Zeigler in the Garnet Lounge in the South End early in November, 1975, and informed Zeigler that the price would be $8,000. Lincoln testified that the two met again a week to 10 days later in the same place. Zeigler said that he could only come up with $3,000, and asked whether Lincoln would lower his price. Lincoln testified that, about one week later, he called Zeigler from Shaheen's office, and Zeigler repeated that he could only raise $3,000. At that point, Lincoln stated, he told Zeigler to get someone else to do the job.

Lincoln testified that he first learned of the fire the following Monday when he went to South Boston Savings. He testified that, after the fire, he had a conversation with Lieutenant DeFuria, in which DeFuria told him that it was a clear case of arson, and that he (DeFuria) was going to seek murder indictments. Following this conversation, Lincoln said he spoke with Shaheen and was asked how much money it would take to pay off DeFuria. Lincoln testified that he told Shaheen to try $500 or $1,000. Afterward, Lincoln testified that he spoke to DeFuria and DeFuria told him that he had been all wrong about the fire, that it had started accidentally in a hallway.

On cross-examination, defense counsel mounted an all out assault on Lincoln's credibility. Lincoln admitted that he had burned approximately fifty buildings for profit. He was questioned at length about his relationship with various other witnesses, including Shaheen, DeFuria, and Bill Schmink, a mortgage loan officer at South Boston Savings Bank. Lincoln was then asked about his involvement in a fire at 45 Milford Street. Lincoln admitted that he had arranged the burning of the building, and that someone had died in the fire.

Defense counsel also cross-examined Lincoln about the terms of his agreement with the Commonwealth. Specifically, counsel asked whether or not Lincoln expected to be tried on any of the seventeen indictments then pending, and Lincoln responded that he didn't know. Finally, Lincoln was asked whether he had made a deal with a publishing company to write or was writing a book about his experiences, and he replied that he was not.

The Commonwealth called several students and former students, some of whom had been tenants at 62 Louis Prang Street at the time of the fire. One of the students testified that she stopped paying rent in September or October of 1975, after her bathroom ceiling fell in and was not repaired. Several students testified that in late October or early November Zeigler brought someone around to look at their apartments. He introduced one person as being from a bank or an insurance company. Finally, the students related their observations of the fire and its effects.

John A. Rose, a former member of the arson squad, testified that based upon his observations, investigation, and experience, the fire began on the first floor and was deliberately set. Defense counsel challenged the sufficiency of the basis for Rose's opinion, but called no expert and introduced no evidence as to the cause of the fire.

Finally, the Commonwealth called State Police Detective Lieutenant Peter DeStephano. DeStephano testified that he questioned Zeigler about the fire in December, 1975. He stated Zeigler told him he had business debts in excess of $600,000 and that he was up to 8 months behind on some of his payments, but he was not worried about it. When asked about the fire at 62 Louis Prang Street, DeStephano testified that Zeigler stated: "You should understand, Lieutenant, that this is the new way to refinance."

The defense proceeded along several tacks. First, as indicated above, defense counsel attacked the credibility of Shaheen and Lincoln. Counsel also sought to establish, through cross-examination and direct testimony, that Zeigler was unaware that the fire insurance policy on 62 Louis Prang Street had been reinstated, and therefore lacked a motive to burn the property. By contrast, the defense attempted to show that South Boston Savings, as first mortgagee, had the greatest financial interest in the property and thus stood to gain the most from the fire.

The defense called William Schmink, a mortgage loan officer for South Boston Savings. Schmink testified that shortly after the fire at 62 Louis Prang Street he authorized repair work on an adjoining property which was performed by Lincoln. Several weeks later, he testified, the Bank deeded 60 Louis Prang Street to Lincoln's wife and took back a $40,000 mortgage.

Lawrence Berman, a public insurance adjuster, testified that on the day of the fire

he contacted Zeigler, who was on duty at a National Guard armory in Newton, Massachusetts, and convinced him to sign a contract authorizing Berman to "adjust" the loss. At the time, Berman stated that Zeigler didn't have any information about insurance on the building at 62 Louis Prang Street, and "there was a question as to whether or not . . . he had insurance or not."

Sandra DeSantis testified that she was Zeigler's girlfriend, Zeigler spent the entire evening and night of December 6, 1975 with her, and he left at 5:30 A.M. on December 7, 1975 to return to the armory.

David Siersdale, Zeigler's business partner, described how he met Zeigler in 1972 when the latter was a senior at Boston College. He indicated that they became partners because Zeigler had access to a line of credit at a branch of the Shawmut Bank. By 1974, the two had acquired some 35 parcels of real estate in the Boston area.

Siersdale indicated that he and Zeigler considered the property at 62 Louis Prang Street a "winner" because of low monthly taxes, a stable tenant situation, and a regular monthly flow of rent. Nevertheless, he testified that by 1975 S & Z Realty was in trouble because of a poor cash flow situation, which Siersdale attributed to a decline in collectible rents, rent control, and increased tax assessments. In June, 1975, Siersdale and Zeigler decided to sell off certain "marginal properties" in an effort to improve their financial position. This effort failed, and by the fall of 1975 they decided to stop making mortgage and insurance payments on all their properties. Siersdale testified that he contacted banks holding mortgages on certain of their properties, including South Boston Savings, and offered to return the deeds to those properties in order to avoid foreclosure. None of the banks accepted his offer, however, and several foreclosure proceedings were instituted.

Siersdale testified that he was in New Hampshire the weekend of the fire at 62 Louis Prang Street. He said that Zeigler was upset when he arrived at his house on December 7 and informed him that a fire had occurred and a person had been killed. Siersdale said the two men agreed there probably was no insurance on the building at the time of the fire.

Finally, Siersdale testified about a meeting with Lieutenant DeFuria after the fire. He stated that DeFuria never asked him for money and that he never paid DeFuria any money.

On cross-examination, Siersdale testified that he never heard of George Lincoln until August or September of 1977, during a grand jury investigation. He stated that at some point in August, 1975, Zeigler told him he had spoken with an arsonist "as a lark." Siersdale denied overhearing a phone conversation between Zeigler and the arsonist, and stated that the subject of Zeigler's meeting with the arsonist never came up after the summer of 1975.

Zeigler next took the stand in his own defense. He too described the demise of S & Z Realty during the summer and fall of 1975. Zeigler could not recall whether he received a notice of cancellation of the fire insurance policy on 62 Louis Prang Street, but specifically stated that he did not receive a reinstatement notice.

Zeigler admitted meeting with an arsonist named "George" late in the summer of 1975. He testified that the meeting was arranged by Shaheen, a man who, according to Zeigler, "always had arson on his mind." Zeigler said he never took Shaheen seriously, but met with George at Shaheen's suggestion. Zeigler said that he and George went to the Garnet Lounge, where George immediately began to talk about burning the building at 62 Louis Prang Street. Zeigler stated that he told George there was no insurance on the property, and George told him to reinstate the insurance coverage and double the policy limits on number 62 and another building located across the street. George then described his method for burning 62 Louis Prang Street, and indicated that his price for the job would be $8,000.

Zeigler stated that he told Siersdale and everyone else at the realty office about his meeting with the arsonist named George. Some time afterward, Zeigler said he received a phone call from George, who asked whether Zeigler had raised the $8,000. At that point, Zeigler testified, he "realized this man George was serious about that meeting." Zeigler said he told George all he could get together was $1,000, and felt "relieved" when George said he couldn't do the job for that amount. Zeigler testified that he never met with or spoke to George again after that conversation, which he claimed took place in late August, 1975.

Zeigler stated he first learned of the fire when Berman called him at the National Guard armory on the morning of December 7. Zeigler acknowledged signing a contract with Berman, but claimed he told Berman he was wasting his time because as far as Zeigler knew there wasn't any insurance on the building. Zeigler testified that he first learned the policy had been reinstated when he was told by a receptionist at a law office several days after the fire.

Zeigler testified that after the fire, he asked Shaheen to roll back the starting date on an insurance binder so that the loss resulting from the fire would be covered, but Shaheen told him it couldn't be done. Zeigler denied ever discussing the possibility of offering Lieutenant DeFuria a bribe to cover up the cause of the fire.

Zeigler also gave his account of the meeting with DeFuria. Finally, he indicated that he received no financial benefit as a result of the fire, and claimed that his statement to DeStephano about arson being the new way to refinance was nothing more than a "sadistic joke."

In rebuttal, the Commonwealth called Bernard Audette, a graduate student who was the office manager at S & Z realty in the fall of 1975. Audette testified that he was present in the office in late September or early October when someone who identified himself as "George" called and asked for Zeigler. Audette overheard part of the subsequent conversation, during which Zeigler agreed to meet with "George." According to the witness, George called again in November, some 2 to 3 weeks before the fire. During that conversation, Audette stated he heard Zeigler, who "was being coached by David [Siersdale] in sign language," say to George, "that would not be acceptable." After the phone conversation, Audette said he told Siersdale and Zeigler he suspected they were considering burning a building and that, if he were correct, Audette would go to the police. At that point, Audette testified, Siersdale and Zeigler said they were "no longer" considering burning a building.

Finally, the prosecutor, without objection, read the following stipulation to the jury:

That if James DeFuria were called to this stand this morning and questioned in connection with this case, that he would invoke his constitutional rights under the Fifth Amendment to refuse to answer questions, the answers to which he would feel would tend to incriminate him.

In his closing argument, defense counsel asked the jury to consider the motives of the witnesses who testified at trial. He stated:

I ask you especially to consider the motive of two government witnesses, George Lincoln and Nicholas Shaheen. Both of those men are in custody. Both of those men have an arrangement with the Commonwealth. Both of those men are driven into this court by a particular motive.

thereafter, on at least 9 occasions, counsel referred to the fact that either Lincoln, Shaheen, or both, were testifying pursuant to a "deal" with the Commonwealth. At one point, he suggested that part of Lincoln's deal was that he would not be brought to trial on any of the seventeen indictments then pending against him, even though Lincoln had earlier denied that the Commonwealth had made such a promise. Defense counsel stated:

When you're talking about Lincoln, again, what has Lincoln been offered? He's got seventeen indictments charging him with everything from murder to arson, and he's never going to go to trial. The Attorney General's office is going to

move him out of state and give him a new identity.

At the same time counsel argued that the Commonwealth was not bound by any deal and, as a result, Shaheen and Lincoln had a *continuing* motive to testify falsely about Zeigler's involvement in the December 7, 1975 fire.

In addition to attacking the credibility of Shaheen and Lincoln, defense counsel questioned the prosecution's evidence concerning the cause of the fire. He then reiterated his central theme, i. e., that Zeigler was unaware the fire insurance policy had been reinstated, and argued that regardless of Zeigler's knowledge, the only party with a sufficiently strong financial incentive to burn 62 Louis Prang Street was Schmink, so that South Boston Saving's mortgage would be paid off and its involvement with the property terminated.

In turn, the prosecutor reviewed the evidence which supported his theory that Zeigler arranged to have the building burned in order to alleviate the financial pressure on S & Z Realty, briefly mentioned the agreements with Shaheen and Lincoln; and pointed out several inconsistencies and implausible aspects of Zeigler's testimony.

The trial judge's charge was comprehensive and evenly balanced. He indicated that the testimony in the case was "miles apart," and that the jury was required to assess credibility in an effort to determine the truth. In assessing the credibility of a particular witness, the judge instructed the jury to determine first, whether the witness had a personal interest in the outcome of the case and, second, to determine whether that personal interest affected the witness' reliability. In addition, the judge admonished the jury not to speculate as to the reason why any witness mentioned in the testimony did not himself testify. He stated:

> There have been names mentioned here of persons who have not testified. You are not to speculate as to the reason why any witness mentioned in the testimony has not testified here. It is of no importance to your consideration of this case.

## III.

Our independent assessment of the record leads us to conclude that the evidence against petitioner was not only strong, but evenly balanced as well. There was no single piece of evidence or testimony that we would regard as critical, or upon which the Commonwealth pinned its hopes of obtaining a conviction. In this regard, the case is somewhat different from others in which courts have been called upon to evaluate claims of prosecutorial misconduct arising largely out of the failure to disclose allegedly exculpatory information. *Compare, e. g., Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (court indicated that government's case depended almost entirely on testimony of key witness); *Woodcock v. Amaral*, 511 F.2d 985, 988 (1st Cir. 1974), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975) (government conceded that conviction could not have been obtained without the testimony of "star" witness and stipulated that a certain portion of that witness' testimony was "crucial"). *Chavis v. State of North Carolina*, 637 F.2d 213, 216 n. 6 (4th Cir. 1980) (prosecution's case depended "entirely" upon the credibility of a particular witness).

As between the Commonwealth's two primary witnesses—Shaheen and Lincoln—Shaheen provided the most direct and damaging testimony. It was Shaheen who furnished the jury with evidence of Zeigler's motive to burn the property, by testifying that he informed Zeigler that the insurance policy covering 62 Louis Prang Street had been reinstated. Shaheen also testified concerning several damaging admissions allegedly made by Zeigler, namely, Zeigler's request for assistance in finding an arsonist to burn the property, and, after the fire, Zeigler's admission of his complicity and request for Shaheen's advice on how to deal with DeFuria. Finally, Shaheen's testimony largely corroborated that of Lincoln, the contract arsonist, concerning his negotiations with Zeigler.

Lincoln's testimony while important, was largely corroborated by Shaheen and, indeed, by Zeigler himself. Zeigler admitted speaking with Lincoln over the phone several times, meeting with him, and discussing possible arson at 62 Louis Prang Street. In fact, Zeigler corroborated Lincoln's testimony as to why the "deal" fell through, i. e., because Lincoln's price for the job was too high. Of course, Zeigler's testimony concerning his state of mind during his conversations with Shaheen and Lincoln contrasted sharply with their version of events, and, to that extent, credibility was an issue in the case.

For this very reason, the testimony of Bernard Audette, the Commonwealth's rebuttal witness, assumed added significance. Having heard Zeigler's testimony concerning his relationship with Lincoln, the jury heard from Audette, a relatively disinterested witness. Audette testified to a radically different version of Zeigler's final conversation with Lincoln, and implicated Siersdale in the arson scheme. If believed by the jury (and little effort was made by defense counsel to discredit it) this testimony must have seriously undercut Zeigler's attempt to portray his dealings with Lincoln as nothing more than an innocent lark.

### IV.

Against this background, we turn to the specific issues raised by petitioner in the instant appeal.

#### A. The Commonwealth's Agreement with Lincoln.

Zeigler first contends that he was denied due process because the Commonwealth failed to disclose the full scope of its agreement with George Lincoln. He further contends that Lincoln testified falsely concerning the agreement, and the prosecutor's failure to correct his false testimony served to aggravate the due process violation.

In accordance with the leading Supreme Court rulings in this area,[1] this Court has established a two-pronged test for deter-

mining when the prosecutor's alleged failure to disclose the terms of a plea bargain requires reversal of a conviction:

> First, the defendant must show that there was a promise of aid made by the Government to a key witness that was not disclosed to the jury. Second, he must demonstrate that, in the language of *Giglio* and *Napue*, "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ..."

*United States v. Ramos Algarin*, 584 F.2d 562, 564 (1st Cir. 1978) (citing *United States v. Bynum*, 567 F.2d 1167, 1168–69 (1st Cir. 1978)).

Lincoln's actual agreement with the Commonwealth was that, in exchange for his truthful testimony about his various criminal activities, the Commonwealth would, among other things, recommend that he not be incarcerated upon the disposition of *any* indictments returned against him. At trial, however, Lincoln testified that the agreement covered seventeen specific indictments pending against him at that time. In its response to petitioner's motion for any promises, rewards, or inducements, the Commonwealth also indicated that the agreement covered only pending indictments. At oral argument, counsel for the Commonwealth asserted that the discrepancy, if one existed, was made in good faith.

In denying Zeigler's motion for a new trial, the motion judge concluded that because Lincoln did not expect any additional charges to be brought against him, his trial testimony constituted "a truthful and accurate account of his general agreement with the Commonwealth." Findings and Rulings, at 7. In addition, because the Commonwealth made the agreement with Lincoln before any indictments had been returned against Lincoln and no additional indictments were in fact returned after Zeigler's trial, the court concluded that the Commonwealth's reference to the specific indictments pending at the time of its response to defendant's motion was also truthful and accurate.

---

1. *See*, e. g., *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ We agree with the district court that both Lincoln and the Commonwealth adequately disclosed the substance of their agreement. Even if we were to assume, however, that there was an aspect of the agreement which was not fully disclosed, we do not believe there is any reasonable likelihood that the non-disclosure could have affected the judgment of the jury in this case.

■ Petitioner argues that the failure to disclose the full extent of Lincoln's deal left the jury with the false impression that he was exposing himself to numerous additional criminal charges which, according to his testimony, would not have been covered by the deal. This false impression, petitioner contends, might have led the jury to conclude that Lincoln was testifying against his own penal interest rather than pursuant to a promise of leniency, and therefore may have caused it to give Lincoln's testimony unjustified weight.

This argument is unsupported by the record. From the outset, Lincoln was portrayed as a contract arsonist. The Commonwealth told the jury that it needed Lincoln's cooperation, and took steps to insure his cooperation, including promises of leniency, placement in protective custody, and assistance in relocating and establishing a new identity. On cross-examination, Lincoln was questioned at length about his extensive involvement in criminal activity and his agreement with the Commonwealth. In closing argument, defense counsel referred several times to Lincoln's "deal." At one point, counsel argued that Lincoln would never be prosecuted for his crimes, incorrectly implying that this was part of Lincoln's agreement with the Commonwealth. Finally, defense counsel argued that, because the Commonwealth was not "bound" by its agreement with Lincoln, he had a continuing motive to lie in order to get the full benefit of his "deal." Under these circumstances, we believe the jury was given an adequate opportunity to assess Lincoln's credibility and determine his motivation in testifying.

In addition, Lincoln was not the crucial witness in this case. Although his version of the meeting and phone conversations with Zeigler partially contradicted Zeigler's story, far more direct incriminating evidence came from Shaheen and the other witnesses. Thus, this was not a case, like *Giglio*, in which the government's case depended entirely on a single witness' testimony. *Contrast* 405 U.S. at 154, 92 S.Ct. at 766.

**B.** *The Commonwealth's Failure to Disclose Exculpatory Evidence.*

■ Petitioner next contends that the Commonwealth's failure to provide certain materials to defense counsel for use during the trial violated his rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Brady*, the Supreme Court held that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor.

In *Agurs*, the Court held that the standard to be used in determining whether evidence is "material" depends upon the circumstances surrounding its non-disclosure. It then articulated three different standards to be applied in specific situations, summarized by this Court as follows:

The first is an instance involving "a corruption of the truth-seeking function of the trial process." 427 U.S. at 104, 96 S.Ct. at 2397, by prosecutorial misconduct as when the prosecution's case includes perjured testimony and the prosecution knew, or should have known, of the perjury. Recognizing that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, the Court stated such a verdict must be set aside if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. This was described as a "strict standard of materiality."

The second situation arises when the defendant has made a specific request for

information and the prosecution has failed or refused to respond to the request, as occurred in *Brady*. Non-response by the prosecutor in such a case, the Court found, "is seldom, if ever, excusable." 427 U.S. at 106 [96 S.Ct. at 2398]. Evidence will be deemed material if "the suppressed evidence might have affected the outcome of the trial." 427 U.S. at 104 [96 S.Ct. at 2397].

Third, when no request is made by defendant, or only a general request is made, information not revealed by the prosecutor will be held to be material only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112 [96 S.Ct. at 2401]. The Court stressed that the "omission must be evaluated in the context of the entire record."

*United States v. Imbruglia*, 617 F.2d 1, 4–5 (1st Cir. 1980).

Among the materials not turned over were some twenty-nine written statements or "impressions" prepared by Lincoln during the late summer of 1977, describing his participation in arson and other criminal activities. Prior to trial, defense counsel requested and the Commonwealth agreed to furnish statements made by prosecution witnesses in accordance with the requirements of state law. *See Commonwealth v. Lewinski*, 367 Mass. 889, 329 N.E.2d 738 (1975).

After Lincoln testified, the Commonwealth furnished defense counsel with a portion of one of the twenty-nine statements describing Lincoln's involvement with the fire at 62 Louis Prang Street. It did not turn over the remaining statements

and defense counsel, though probably aware of the existence of at least some of the statements,[2] did not press his motion to compel their production.

After examining all the statements in connection with Zeigler's motion for a new trial, the motion judge concluded that none of the undisclosed statements mentioned either the defendant or the fire at 62 Louis Prang Street; all the statements which related to Lincoln's testimony at trial were disclosed; and the information contained in the undisclosed statements merely corroborated Lincoln's extensive involvement in criminal activity, a fact which was well known to defense counsel prior to trial and freely admitted by Lincoln both on direct and cross-examination.

■ We have reviewed the sixteen statements included in the record on appeal,[3] and agree with the motion judge that the statements were unrelated to the subject matter of Lincoln's testimony. *See United States v. Ferreira*, 625 F.2d 1030, 1033–34 (1st Cir. 1980) (failure to provide statements unrelated to "general context" of witness' testimony does not violate due process). The statements contain nothing more than the details of Lincoln's involvement in various unrelated crimes. *See United States v. Previte*, 648 F.2d 73, 85 (1st Cir. 1981) (failure to furnish cumulative evidence of unrelated crimes by key prosecution witness did not violate *Brady*). In this regard, we note that counsel for petitioner do not even allege a single inconsistency between anything contained in the statements and Lincoln's testimony at trial. *Compare*, e. g., *Giles v. Maryland*, 386 U.S. 66, 74–76, 87 S.Ct. 793, 797–798, 17 L.Ed.2d 737 (1967)

---

**2.** In ruling on petitioner's motion for a new trial, the motion judge found as fact that defense counsel had attended a meeting of counsel for various arson defendants at which an agreement to share information was made. On the basis of this finding, the judge concluded it was reasonable to assume that defense counsel had knowledge of or obtained access to those written statements furnished by Lincoln that were provided by the Commonwealth to defense counsel in the other cases. As to the effect of defense counsel's knowledge of allegedly exculpatory material on the prosecu-

tion's obligation to disclose the material, *see United States v. DeLeo*, 422 F.2d 487, 498–99 (1st Cir.), *cert. denied*, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970) (indicating that, even where the information is material, no prejudice results when defense counsel already possesses the information).

**3.** The remaining statements, although made part of the record at the hearing on petitioner's motion for a new trial, were impounded by the court and are not part of the record on appeal.

(where critical issue in the case turned wholly upon credibility of important government witness, failure to disclose reports containing, *inter alia*, prior inconsistent statements which could have been used to effectively impeach credibility may constitute denial of due process).

Petitioner argues that the statements are material because they allegedly contain information which would have provided a factual basis upon which defense counsel might have requested a so-called "perjurer" instruction.[4] Petitioner cites only one case, *United States v. Projansky*, 465 F.2d 123, 136 (2d Cir.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972), in support of this contention. In *Projansky*, the Second Circuit held that the trial court did not err in instructing the jury that they could accept or reject the testimony of a government witness who admitted having committed perjury on prior occasions. 465 F.2d at 136 and n.24. We frankly cannot see how such an instruction, as compared to the one given in this case, could have materially affected the jury's assessment of Lincoln's credibility.[5]

In any event, the record indicates that Lincoln's prior acts of perjury were matters of public record by the time of Zeigler's trial. During the hearing, Lincoln freely admitted having committed perjury on numerous occasions. Had he been asked these questions at trial, Lincoln would presumably have given identical answers. The entire record reveals that Lincoln made no effort to conceal his past crimes and other bad acts, but admitted them candidly.

Concededly, evidence that tends to impeach the credibility of a government witness falls within the scope of the *Brady* rule. *See Giglio*, 450 U.S. at 154, 92 S.Ct. at 766; *Woodcock v. Amaral*, 511 F.2d at 990, n.5; *but see Garrison v. Maggio*, 540 F.2d 1271, 1274 (5th Cir.), *reh. denied*, 544 F.2d 518, *cert. denied*, 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977) (Fifth Circuit applies a more rigorous standard of materiality where evidence is useful only for impeachment). Where it is merely cumulative, however, courts generally reject the contention that such evidence is material. *See Giles v. Maryland*, 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring); *United States v. Imbruglia*, 617 F.2d at 7; *United States v. Shelton*, 588 F.2d 1242, 1248 (9th Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979). This is true even where there has been a specific defense request for the information, *see DeMartino v. Weidenburner*, 616 F.2d 708, 710–13 (3d Cir. 1980), and the information, if disclosed, could have been used to impeach a "key" prosecution witness, *see United States v. Previte*, 648 F.2d at 85; *United States v. Goldberg*, 582 F.2d 483, 490 (9th Cir. 1978), *cert. denied*, 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979) (prior history omitted); *Lewinski v. Ristaino*, 448 F.Supp. 690, 694–96 (D.Mass. 1978), so long as the defense had an adequate opportunity to impeach the witness by other means.

Although Lincoln's credibility was not the most critical issue in this case, his credibility was thoroughly impeached on cross-examination by competent counsel. The in-

---

4. Petitioner also argues that information in the statements would have assisted defense counsel in determining the true extent of Lincoln's agreement with the Commonwealth. Since we regard any non-disclosure of the agreement as insignificant, *supra* at 263–264, we reject this aspect of petitioner's claim as well.

5. In addition to the other references to credibility sprinkled throughout the charge, the jury was instructed as follows:

In evaluating the testimony of any witness, you have a right to accept his testimony completely; you have a right to reject his testimony completely; or, in between those

two extremes, you may accept part of a witness' testimony and reject the remainder. It is entirely up to you as to how you go about it and what you accept and reject.

\* \* \* \* \* \*

In determining the credibility of a witness, you should determine whether or not that witness had a personal interest in the outcome of this case, and if you find that a witness does have such a personal interest, then you should examine further to determine whether or not that personal interest affected that witness' credibility and reliability.

formation contained in the undisclosed statements did not relate to the substance of Lincoln's testimony. It was merely cumulative impeachment evidence and much of it was obviously known to defense counsel prior to trial, as it was extensively covered on cross-examination and in argument. Under these circumstances, even assuming the defense request for the statements was sufficiently specific to trigger the more rigorous standard of materiality set forth in *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397, we cannot say that the statements might have affected the outcome of the trial.[6]

Petitioner next challenges the Commonwealth's failure to turn over a psychological evaluation of George Lincoln prepared by Dr. Samuel Allen of the Massachusetts Correctional Institution at Bridgewater in January, 1969. The letter advised the presiding judge in an unrelated state prosecution that, as a result of observation and testing, it was the opinion of the MCI-Bridgewater staff that Lincoln was competent to stand trial. After describing his educational background, work experience, prior hospitalizations, and a drinking problem which Lincoln claimed to have overcome, the letter stated:

During his current period of observation, patient has been cooperative and oriented in all spheres. His insight and judgment were somewhat impaired. At times he smiled inappropriately and his affect was shallow. He appears to function on an average level of intelligence, but there is a noticeable paranoid coloring to most of his responses.

It is the opinion of the staff that at present, patient evidences no signs of an overt psychosis. He knows the nature and object of his charges and appears able to assist counsel in his own defense. Therefore, his return to court as competent to stand trial is recommended.

The letter concluded by indicating a diagnosis of "Paranoid Personality."

Petitioner contends that, had it been made available to defense counsel before or during his trial, the Bridgewater letter would have provided a "springboard" for an "otherwise undeveloped line of impeachment." [7]

■ Since petitioner's trial counsel never specifically requested mental records or psychological evaluations of Lincoln or any

---

**6.** The motion judge and the district court both regarded petitioner's request to inspect "all statements of witnesses upon which the Commonwealth intended to rely at trial" as a *general* request within the meaning of *Agurs*. Findings and Rulings, at 18. *See* discussion *supra* at 264–265. Accordingly, they examined the statements only to determine whether they created a reasonable doubt that did not otherwise exist, and determined that they did not.

This Court has not conclusively determined whether a defense request for all prior witness statements constitutes a specific request or a general request under *Agurs*, nor have we been asked to do so in this case. *But see United States v. DiCarlo*, 575 F.2d 952, 958–60 (1st Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978) (request for, *inter alia*, evidence which may tend to "impeach or discredit incriminatory evidence . . . or which may lead to evidence of such character" considered a general request); *United States ex rel. Moore v. Brierton*, 560 F.2d 288–292 (7th Cir.), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794, *reh. denied*, 435 U.S. 962, 98 S.Ct. 1594, 55 L.Ed.2d 812 (1978) (request for all witness statements considered a general request). Because we believe petitioner's claim fails under

either standard, we need not decide which one applies in this case. *Accord, United States v. Goldberg*, 582 F.2d at 488; *Lewinski v. Ristaino*, 488 F.Supp. at 694.

**7.** At the hearing on petitioner's motion for a new trial, Dr. Bernard Yudowitz, a psychiatrist who testified on behalf of defendants in other arson cases in which Lincoln appeared as a prosecution witness, stated that based upon his review of various documents including the Bridgewater letter, his observations of Lincoln at a trial which took place after Zeigler had been convicted, and an interview with Lincoln's ex-wife, he diagnosed Lincoln as suffering from a paranoid personality. Dr. Yudowitz also testified that, in his opinion, Lincoln's mental disorder affected his capacity to perceive, remember, and articulate correctly on the date he testified against Zeigler.

In assessing the materiality of the Bridgewater letter, we have in mind that it may have led to an attempt by defense counsel to introduce just this sort of impeachment testimony. We express no opinion as to the likely form of such testimony or its admissibility.

other prosecution witness,[8] the Bridgewater letter can be regarded as "material" within the meaning of *Brady* and *Agurs* only if it creates a reasonable doubt that did not otherwise exist. Even if Lincoln's credibility had been the critical issue in the case we doubt that the letter would satisfy this standard.

In *Chavis, supra,* the Fourth Circuit held that the prosecution's failure to provide defense counsel with a psychiatric evaluation of its key witness violated the defendants' due process rights. Prior to trial, defense counsel had specifically requested "any and all scientific or medical, psychiatric or other reports which might tend to reflect on the credibility or competence of any . . . witness." 637 F.2d at 220. The report in *Chavis,* prepared under circumstances virtually identical to those in the instant case, described the witness as "borderline defective," and, the court reasoned, "may have some bearing on [the witness'] ability to recall in minute detail events that occurred at least one and one-half years prior to the time he was testifying." *Id.*

Nevertheless, despite the fact that the state's case depended entirely on the credibility of the witness in question, 637 F.2d at 224, n.6, the court indicated that it would not have regarded the psychological report as material if defense counsel had made only a general request for it.

The court stated:

> As we see it, the only problem that non-production of the hospital report presents is the test to be applied in determining if petitioners were denied due process. If defense counsel made only a general request for exculpatory material, we do not think that the *Agurs* test was satisfied because we cannot say that, standing alone, the effect of the hospital report on Hall's credibility would create a reasonable doubt of guilt where one did not theretofore exist.

637 F.2d at 224. The court then analyzed the request in *Chavis;* found it specific enough to trigger the more rigorous stan-

dard of materiality; and concluded that the report was material.

As indicated above, we do not regard Lincoln's credibility as having the same degree of importance as that of the government's witness in *Chavis.* Accordingly, we need not decide whether we would reach the same conclusions as the Fourth Circuit if presented with a more closely analogous fact situation. We rule only that in the circumstances of this case, the district court did not err in concluding that the Bridgewater letter did not create a reasonable doubt that did not otherwise exist. *See United States v. Previte,* 648 F.2d at 85; *United States v. Imbruglia,* 617 F.2d at 6–7; *United States v. Shelton,* 588 F.2d at 1248.

Zeigler's most troublesome claim based on the Commonwealth's non-disclosure of allegedly exculpatory evidence is that the failure to provide defense counsel with a portion of James DeFuria's grand jury testimony violated his rights under *Brady* and *Agurs.* DeFuria was the state police lieutenant assigned to investigate the fire at 62 Louis Prang Street. He testified before a grand jury that the fire was of undetermined cause; that he never told Lincoln it was a clear case of arson; that he never received any money from Zeigler in return for not charging him with crimes arising out of the December 7 fire; that Zeigler had taken and passed a polygraph test; and that Lincoln never introduced him to anyone at the South Boston Savings Bank.

Prior to trial, defense counsel filed a motion to inspect the minutes of the grand jury that indicted Zeigler. Thereafter, the Commonwealth provided defense counsel with the grand jury minutes of those witnesses who were to testify against Zeigler at trial. At a subsequent hearing on that and other discovery motions, counsel waived his request to inspect the grand jury minutes. At the time of the waiver, the record indicates defense counsel knew that DeFuria had testified before the grand jury. He also knew that DeFuria denied any involve-

---

8. The record indicates that the letter was furnished to defense counsel in other cases in which mental records had been specifically requested.

ment in the fire at 62 Louis Prang Street. Accordingly, in determining whether the DeFuria testimony was *material* exculpatory evidence and should have been turned over, we must apply the standard governing material covered by either a general defense request for exculpatory evidence or no request, i. e., whether the omitted evidence creates a reasonable doubt that did not otherwise exist. *Agurs,* 427 U.S. at 112,[9] 96 S.Ct. at 2401.

In reaching the conclusion that the transcript of DeFuria's grand jury testimony was not material, both the new trial motion judge and the district court below assumed without discussion that, had it been available, the transcript would not have been admissible at trial, presumably on hearsay grounds. Since defense counsel was aware of the substance of DeFuria's testimony the courts below concluded, and the Commonwealth argues here, the defense was in no way prejudiced by not having the actual transcript.

Were we to agree that the transcript would have been inadmissible, we would not hesitate to conclude that Zeigler was in no way prejudiced. *See United States v. De-Leo, supra,* 422 F.2d at 498–99. However, under certain circumstances, some courts have admitted grand jury testimony of a witness who, for one reason or another, was unavailable at trial. *Compare United States v. Garner,* 574 F.2d 1141, 1144 (4th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); and *United States v. Carlson,* 547 F.2d 1346, 1353–55 (8th Cir.), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977) (grand jury testimony admitted at *request of prosecution*), with *United States v. Henry,* 448 F.Supp. 819, 821 (D.N.J.1978); and *United States v. Driscoll,* 445 F.Supp. 864, 866 (D.N.J.1978) (grand jury testimony admissible on motion of defense counsel under prior testimony

exception to hearsay rule). *See also United States v. Klauber,* 611 F.2d 512, 516–17 (4th Cir.), *cert. denied* 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980). In addition, this Court has ruled that a witness who invokes the Fifth Amendment and refuses to testify is "unavailable" within the meaning of Federal Evidence Rule 804, the applicable *federal* provision. *United States v. Zurosky,* 614 F.2d 779, 792 (1st Cir.), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980).

Although the Massachusetts Supreme Judicial Court has not conclusively determined the circumstances under which it will allow a defendant to introduce the prior grand jury testimony of a witness unavailable at trial, it has by no means adopted a uniform rule of exclusion. *See Commonwealth v. Meech,* —— Mass. ——, 1980 Mass.Adv.Sh. 1065, 403 N.E.2d 1174, 1178 (1980) (court acknowledged existence of substantial support for admissibility of grand jury transcripts under prior recorded testimony exception); *Commonwealth v. Shagoury,* —— Mass.App. ——, 1978 Mass.App.Ct.Adv.Sh. 927, 380 N.E.2d 708, 715–716 (1978) (court assumed admissibility of grand jury transcript).

Assuming the admissibility of the grand jury transcript, the critical question is whether it creates a reasonable doubt that did not otherwise exist. The district court correctly observed that the fact that Zeigler had taken and passed a polygraph test was known to defense counsel, was testified to at trial, and was stricken from the record at the request of the defense. Defense counsel apparently was not aware that DeFuria had denied being introduced to South Boston Savings by Lincoln. However, we agree with the district court that this evidence could not have had more than a *de minimis* effect on the trial, either as substantive or impeachment evidence. The

**9.** The record indicates that prior to trial, defense counsel informally made an oral request for any statements of DeFuria. Findings and Rulings, at 9. We need not decide under what circumstances such an informal oral request may obviate the need for a formal motion and trigger the more rigorous standard of materiali-

ty governing evidence that is the subject of a specific defense request. *See Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397. In this case, the record clearly indicates that counsel's waiver of his request for grand jury material came *after,* and thus nullified, any prior informal request for DeFuria's grand jury testimony.

only portion of the transcript which troubles us, therefore, is that in which DeFuria claimed the fire was of undetermined cause and denied receiving a bribe to cover up the true cause.

Concededly, the Commonwealth introduced evidence from which the jury could have concluded that Zeigler bribed DeFuria to falsify his official report as to the cause of the fire. DeFuria's grand jury testimony, if believed, would have contradicted Lincoln's testimony about DeFuria's involvement in the alleged coverup, thereby weakening this aspect of the Commonwealth's case. Even under these circumstances, however, there was ample evidence, unrebutted by DeFuria's grand jury testimony, upon which the jury could have concluded that Zeigler was responsible for the fire. *Cf. United States v. Zicree*, 605 F.2d 1381, 1389–90 (5th Cir. 1979), *reh. denied*, 609 F.2d 826, *cert. denied sub nom. Kaufman, et al. v. United States*, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980) (newly discovered grand jury testimony of witness who refused to testify at trial not regarded as material where, *inter alia*, testimony did not contradict the critical incriminating testimony of trial witnesses).

Moreover, we are unable to concede that the jury would have believed DeFuria's self-serving account of his involvement in the cover-up. Since any admission on his part would have exposed him to potential criminal prosecution, DeFuria had an obvious motive to lie to the grand jury. That incentive was even greater in this instance because the fire had resulted in a death. Shortly after testifying before the grand jury, DeFuria was indicted and convicted on numerous arson and bribery charges. During petitioner's trial, the jury learned that DeFuria was incarcerated, and that Sheehan had been convicted of bribing DeFuria in several unrelated cases. Doubtless, all of these facts would have seriously undermined DeFuria's credibility *in absentia* had the grand jury testimony been admitted.

■ Considering the record as a whole, including the fact that the substance of DeFuria's grand jury testimony was known to defense counsel, we are unable to conclude that the DeFuria transcript, had it been provided to defense counsel and admitted into evidence would have created a reasonable doubt as to the petitioner's guilt. *Cf. United States v. Shelton*, 588 F.2d at 1248–49.[10]

### C. The DeFuria Stipulation.

Petitioner's final claim relates to the admission into evidence at trial of a stipulation. At the close of the evidence, the prosecutor informed the jury that he and defense counsel had stipulated that, if called, DeFuria would have asserted his Fifth Amendment rights and refused to testify. *See* discussion *supra* at 261–262.

At no time did defense counsel object to the reading of the stipulation, move to strike the prosecutor's remarks, or request a cautionary instruction from the trial judge. The judge later routinely instructed the jury that they might draw a reasonable inference from the testimony, exhibits, and stipulations admitted into evidence. He cautioned the jurors, however, "not to speculate as to the reason why any witness mentioned in the testimony has not testified here." Defense counsel neither objected to

10. Shelton was convicted of willfully filing a false income tax return. At trial, one Prohaska, the key government witness, testified that he was present at a meeting attended by Shelton and his accountant, the purpose of which was to cover up Shelton's receipt of taxable income. At trial, the defense made a specific request for any interview reports of the accountant, who did not testify. The accountant had given a statement to the Internal Revenue Service in which he protested his innocence and denied knowledge of any payoffs or cover-ups. The Ninth Circuit acknowledged that the report, if produced, could have been used to contradict Prohaska's testimony about the cover-up. Accordingly, the court conceded that non-disclosure in the face of a *specific* defense request would have violated the strict standards of materiality governing such a request. Nevertheless, it stated that, "in view of the substantial impeachment of Prohaska from other evidence, the addition of [the accountant's] testimony would not have created a reasonable doubt that did not otherwise exist." 588 F.2d at 1249.

this portion of the charge, nor requested a more specific instruction concerning any inferences that might be drawn from the DeFuria stipulation.

Petitioner now contends that the prosecutor's reading of the stipulation and the court's alleged failure to caution the jury, *sua sponte*, not to draw any adverse inferences from it deprived him of his constitutional rights of due process and confrontation. He asserts, without any citation of supporting authority, that since it has been held improper under certain circumstances for a prosecutor to purposefully elicit a witness' assertion of the Fifth Amendment privilege in the presence of the jury, it is necessarily also improper for the prosecutor to read a stipulation that, if called, a witness would have claimed the privilege and refused to testify. In either case, petitioner argues, the jury is invited to draw adverse inferences from "testimony" which cannot be challenged through cross-examination.

We doubt whether the district court, in denying relief, should have reached the merits of petitioner's claim in view of defense counsel's failure to object to the stipulation at trial. *See Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In *Wainwright*, the Court held that, absent a showing of "cause" for trial counsel's failure to make a timely objection and a showing of actual prejudice from the admission of constitutionally tainted evidence, the failure to object in accordance with applicable state procedural rules constitutes an independent and adequate state ground which bars review of petitioner's federal constitutional claim in a subsequent habeas corpus proceeding.

■ Since *Wainwright* was decided, this Court has had several occasions to apply the

cause and prejudice standard, including at least one in which petitioner claimed that her rights of cross-examination and confrontation had been violated at trial. *See Cheek v. Bates*, 615 F.2d 559, 562 (1st Cir.), *cert. denied*, 446 U.S. 944, 100 S.Ct. 2172, 64 L.Ed.2d 800 (1980). Since petitioner has not even attempted to satisfy the rule, nor suggested any reason why it ought not apply in this instance,[11] it would appear that he has lost the right to challenge the admission of the DeFuria stipulation. However, since the district court did not rely on *Wainwright*, and neither party has addressed its application in this Court, we consider it appropriate to comment on the merits of petitioner's claim.

The leading case in this area is *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). In *Namet*, the Supreme Court affirmed this Court's rejection of the defendant's claim that the trial court committed reversible error by permitting the prosecutor to knowingly elicit an assertion of the Fifth Amendment privilege from two key witnesses in the presence of the jury. The Court indicated that in order to determine whether prejudicial error has occurred, courts should examine the particular circumstances involved in each case focusing on two factors, each of which suggests a distinct ground of error.

■ First, the Court suggested that error may result from prosecutorial misconduct when the government makes a "conscious and flagrant" attempt to built its case out of inferences arising from the witness' assertion of the Fifth Amendment privilege. 373 U.S. at 186, 83 S.Ct. at 1154. Second, the Court indicated that, in the circumstances of a given case, prejudicial error

11. Petitioner initially sought to raise the issue of the admissibility of the DeFuria stipulation on direct appeal. In accordance with established precedent, *see, e. g., Commonwealth v. Freeman*, 352 Mass. 556, 563–64, 227 N.E.2d 3 (1967), the Massachusetts Appeals Court restricted its review of Zeigler's claim to a determination of whether admission of the evidence amounted to "a substantial miscarriage of justice." *Commonwealth v. Zeigler*, 399 N.E.2d at 50. We do not regard this limited relaxation of

its contemporaneous objection rule as a waiver by the Massachusetts court of the rule sufficient to preclude the application of *Wainwright*. *See Hardy v. Callahan*, 634 F.2d 646, 647–48 (1st Cir. 1980). *Accord Breest v. Perrin, et al.*, and *Martineau v. McCarthy, et al.*, 655 F.2d 1 at 3 (1st Cir. 1981) (state court's occasional grant of relief from strict enforcement of procedural requirements does not invalidate an otherwise adequate state ground for the purpose of *habeas* relief).

may be committed where inferences from a witness' refusal to answer add "critical weight to the prosecution's case." *Id.* at 187, 83 S.Ct. at 1155.

On the facts of *Namet*, the Court refused to infer that the prosecutor's conduct amounted to "planned or deliberate attempts by the Government to make capital out of witnesses' refusal to testify." *Id.* It stated:

We are particularly reluctant to fasten such motives on the Government's conduct where, as here, defense counsel not only failed to object on behalf of the defendant, but in many instances actually acquiesced in the procedure . . .

*Id.* The Court also concluded that, because the claims of privilege "were at most cumulative support for an inference already well established" by other testimony, they were not so significant as to justify reversal in the absence of prosecutorial misconduct. *Id.* Finally, the Court rejected the argument that the trial judge committed reversible error by failing to take affirmative steps to alleviate any prejudice arising from the prosecutor's conduct.

In applying the two-pronged *Namet* test in particular cases, courts have considered a number of factors including: the prosecutor's intent in calling the witness; the number of questions which elicit an assertion of the Fifth Amendment privilege; whether defense counsel objects to the prosecutor's conduct; whether the prosecutor attempts to draw adverse inferences in closing argument from the witness' refusal to testify; whether defense counsel himself attempts to rely upon the assertion of privilege or other aspects of the witness' testimony; whether the allegedly adverse inferences drawn from an assertion of the testimonial privilege relate to central issues in the case or collateral matters; and whether the inference is the only evidence bearing upon the issue or is cumulative of other evidence. *See Namet, supra; Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934

(1964);[12] *Robbins v. Small, III,* 371 F.2d 793 (1st Cir.), *cert. denied,* 386 U.S. 1033, 87 S.Ct. 1483, 18 L.Ed.2d 594 (1967); *Rado v. State of Connecticut,* 607 F.2d 572, 581 (2d Cir.), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980).

■ Assuming that the above principles apply at all in a case where defense counsel voluntarily stipulates that a witness, if called, would have refused to testify, and fails to object when the stipulation is read to the jury, we are convinced that there was no constitutional error in this instance under either prong of the *Namet* test. To begin with, the reading of the stipulation was merely one isolated event in the course of a relatively lengthy trial. The prosecutor did not even mention the stipulation in closing argument, much less ask the jury to draw any inferences from it.

The record does not disclose the prosecutor's actual motivation in reading the stipulation. Petitioner asserts that the prosecutor improperly sought to bolster the inference that Zeigler bribed DeFuria to cover up the cause of the fire, an inference that could fairly be drawn from the earlier testimony of Shaheen and Lincoln. However, it appears equally possible that because of the many references to DeFuria during the trial, the prosecutor simply did not want the jury to speculate as to why he had not produced this seemingly important witness.

Turning to the second prong of the *Namet* test, we note that any adverse inferences drawn from the stipulation relate only to whether Zeigler bribed DeFuria. This issue, while not insignificant, was certainly collateral to the central issue in the case, i. e., whether Zeigler procured the burning of his own building at 62 Louis Prang Street. *Compare Robbins,* 371 F.2d at 795 (adverse inference, if drawn, would have furnished evidence on practically every essential element of the crime). In addition, since DeFuria had already been linked to the fire and alleged cover-up by Shaheen and Lincoln, any impermissible inference drawn

---

12. In *Douglas,* the principles announced in *Namet* were elevated to a constitutional plane. The analysis, however, remained the same.

*See, e. g., Labbe v. Berman,* 621 F.2d 26, 28 (1st Cir. 1980).

from DeFuria's refusal to testify was merely cumulative of their testimony. *See Namet,* 373 U.S. at 189, 83 S.Ct. at 1156.

However, by far the strongest indication that Zeigler was not prejudiced by the reading of the stipulation is the fact that defense counsel failed to object to the procedure. While the record does not clearly indicate that the failure to object was the result of a conscious tactical decision, it does suggest at a minimum that defense counsel did not perceive the stipulation as so clearly harmful to his client's position to require corrective action. *See Estelle v. Williams,* 425 U.S. 501 at 510 n.5, 96 S.Ct. 1691 at 1696 n.5, and 512 n.9, 96 S.Ct. at 1697 n.9 (1976).

The defense theory of the case was that Zeigler was not responsible for the fire because he lacked any motive to burn the property. Throughout the trial, but particularly in closing argument, counsel sought to contrast Zeigler's position with that of other figures, such as the mortgage loan officer at South Boston Savings who, he claimed, had a strong financial incentive to burn the property at 62 Louis Prang Street. Counsel never contended that DeFuria was not bribed to cover-up the cause of the fire. Rather, the defense impliedly suggested that if anyone bribed DeFuria it was an official at South Boston Savings. Since there is nothing inconsistent between the above theory and the knowledge that, if called, DeFuria would have refused to testify about his involvement in the fire, there was no apparent prejudice and therefore no reason for defense counsel to object to the reading of the stipulation.

Finally, we disagree with petitioner's contention that the trial judge made no attempt to minimize the effect of the stipulation. His admonition that the jury not speculate about the reasons why any witness failed to testify, in our view, eliminated any prejudice that might have resulted from the reading of the stipulation. Under the circumstances, it is difficult to imagine what more the trial judge could have done to safeguard petitioner's rights.

*Affirmed.*