**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Warren IRWIN, Jr.,
Defendant-Appellant.**

No. 81–2088.

United States Court of Appeals,
Fifth Circuit.

Nov. 20, 1981.

---

Phil Burleson, Michael D. McKinley, Dallas, Tex., for defendant-appellant.

Christian Harrison, Asst. U. S. Atty., Tyler, Tex., for plaintiff-appellee.

Before GEE and RUBIN, Circuit Judges, and SPEARS *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

A pharmacist appeals from his conviction on two counts of unlawfully dispensing Preludin, a controlled substance, outside the usual course of medical practice. We find his challenges to the jury instructions and the prosecution's remarks during trial without merit. We also conclude that the district court did not err in denying his motion for a new trial based on his post-trial discovery that a state agent whose efforts initiated the prosecution and who testified at trial had not corrected the misstatement of another government witness because, even if this had been known, it would not likely have changed the result. Accordingly, we affirm.

### I.

James Irwin, the appellant, is a registered pharmacist who owns and operates a pharmacy in Longview, Texas. As the result of a routine investigation, John Hitt, an investigator for the Texas Department of Public Safety, became suspicious that Irwin was illegally dispensing Preludin, *i. e.*, that Irwin was filling prescriptions for Preludin that he knew were not issued in the usual course of medical practice for a legitimate medical purpose.

His suspicions thus aroused, Hitt enlisted Janice Godfrey, whom he knew to be a Preludin dealer, as an informer in exchange for a promise of immunity. Godfrey described to Hitt her past transactions with Irwin and, in accordance with Hitt's in-

---

* District Judge of the Western District of Texas, sitting by designation.

structions, made three additional purchases of Preludin from Irwin using forged and, in some instances, facially invalid prescriptions. Hitt electronically eavesdropped on the conversations which ensued between Godfrey and Irwin during these three transactions and recorded the final one.

Hitt also enlisted as an informer Tom James, another person whom Hitt knew to be a Preludin dealer. While James did not, as Godfrey had done, make any additional purchases of Preludin under Hitt's surveillance, he did describe to Hitt his past dealings with Irwin. James related that Irwin filled many Preludin prescriptions for him and that Irwin had also on three occasions sold James amounts of Preludin above and beyond the quantities called for in the prescriptions then being filled.

On the basis of this information and other evidence, Irwin was indicted on eight counts of unlawfully dispensing a Schedule II controlled substance, Preludin, pursuant to prescriptions that he knew were not issued in the usual course of medical practice for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1) and 21 C.F.R. § 1306.04(a), and three counts of unlawfully distributing Preludin, not pursuant to any prescription, in violation of 21 U.S.C. § 841(a)(1). Four of the "unlawful dispensing" counts involved delivery of Preludin to Godfrey, and the other four "unlawful dispensing" counts and all three "unlawful distribution" counts involved delivery to James.[1]

Godfrey, James and Hitt were the major government witnesses at trial. Godfrey testified in general about her dealings with Irwin and specifically about the three occasions when she bought Preludin from Irwin pursuant to Hitt's instructions.[2] During her cross-examination, the following dialogue occurred:

Q. The money that you were given [by Hitt] to buy drugs, is that the only money that was given you by any law enforcement agency any time up to the present?

A. Yes.

This answer was in fact untrue; Hitt had given Godfrey $60 to $70 prior to trial for expenses.[3] Hitt, however, was not asked about any payments he might have made to Godfrey.

Hitt, during his testimony, related the background facts of his initial routine investigation of Irwin's pharmacy. He said that he first became suspicious of Irwin when he noticed what seemed to be an inordinately large number of Schedule II prescriptions being filled by Irwin, that many of the prescriptions were for people whom Hitt knew or suspected to be drug dealers, and that Irwin acted nervously during Hitt's visits. Hitt told of his recruitment of Godfrey and James as informers, and what he had overheard of the secretly recorded conversations between Godfrey and Irwin during Godfrey's three directed purchases of Preludin.

James testified that he had originally been given a prescription for Preludin to help him lose weight. He soon learned, however, that he could sell Preludin tablets for $10 to $15 each, so he began going to doctors who would give him prescriptions. He would then take these prescriptions to Irwin's pharmacy to be filled. James stated that when he first started taking the prescriptions to Irwin, he was charged $18 for thirty 75 milligram tablets, but, after he began buying Preludin frequently, Irwin told him, "You must be selling them," and "They're going out on the street selling them, so we're going to change to $1 to $1.50 apiece." Thereafter, Irwin charged James from $30 to $40 for thirty tablets. James also identified a number of prescriptions that Irwin had filled for him.

---

1. One of the "unlawful dispensing" counts involving James was dismissed prior to trial.

2. The substance of Godfrey's testimony is not related here because Irwin's appeal is only from his conviction on two counts of "unlawful dispensing" involving delivery to James. See text and note at note 4 infra.

3. Hitt also gave Godfrey another $200 at the end of trial.

James also testified that, after he was arrested for possession of drugs, he asked Irwin to prepare a list of all prescriptions that Irwin's pharmacy had filled for him over the past year. Irwin agreed, but told James that he would not show that James had received "too many Preludins together. He'd only show maybe one or two." The list, which was admitted into evidence, showed only one Preludin prescription, and omitted at least seven others.

Finally, James added that, shortly after Irwin was indicted, Irwin came to James's house to get a statement from James denying that Irwin had ever sold him "extra" Preludin. When James refused, Irwin threatened him.

There was other testimony pointing to Irwin's guilt. For example, Irwin's sales of Preludin dropped from 1400 tablets in a two-month period to 422 during the first two months of the investigation and finally to 180 in a two-month period when it continued. Another pharmacist from the same area testified that his pharmacy sold only about 100 Preludin tablets every four months and that its charge was only $12.50 to fill a prescription for thirty Preludin 75 milligram tablets.

The jury found Irwin guilty on all four of the counts involving delivery to Godfrey ("the Godfrey counts") and two of the "unlawful dispensing" counts involving James ("the James counts"); it returned "not guilty" verdicts as to all the rest. At a post-trial hearing on a motion for a new trial, Hitt revealed for the first time that he had made payments to Godfrey. Irwin then amended his motion to include arguments based on Godfrey's alleged perjury at trial. Irwin's motion was subsequently granted as to the Godfrey counts,[4] but the court reserved decision on the motion as it related to the James counts until further discovery could be had as to whether any other payments had been made to government witnesses. After this discovery was completed, and no other payments were disclosed, the trial judge denied Irwin's motion for a new trial on the James counts.

Irwin's appeal is thus from his conviction on the James counts and from the district court's denial of his motion for a new trial on those counts. We examine the latter point first.

## II.

Irwin contends that inconsistencies within Hitt's testimony concerning the Godfrey payments at the post-trial hearing, further discrepancies between that testimony and documents relating to those payments produced pursuant to the post-trial discovery order, and, most importantly, Hitt's failure to correct Godfrey's incorrect statement at trial[5] combine to place "a significant taint on all of [Hitt's] sworn testimony, including that adduced at trial." Reduced to its essentials, Irwin's argument is that he should have been granted a new trial on the James counts because he was deprived of the opportunity to impugn Hitt's credibility by interrogating Hitt about his failure to correct Godfrey's misstatement.[6]

Although it is not clear from Irwin's briefs, his argument seems to be

---

4. The district court subsequently granted the government's motion to dismiss the Godfrey counts.

5. Although Hitt was present throughout the trial, he apparently made no effort to inform either the prosecutor or the court of Godfrey's misstatement. As noted, however, Hitt was not asked about these payments, and thus did not himself testify incorrectly.

6. Irwin also argues that there were inconsistencies in Hitt's testimony at the post-trial hearing and between that testimony and documentation later produced. Having read the record ourselves, we find no inconsistencies of any signif-

icance. For example, the greatest inconsistencies urged by Irwin relate to the purpose for which Godfrey was given $200 at the conclusion of trial. *See* note 3 *supra.* Hitt first stated that this money was paid to Godfrey "for being an informant." He later said that it was paid "to reimburse her for her expenses." Finally, he stated that the $200 was paid to "help her move because she received many threats on her life." Government records indicate only that the $200 was paid "for information." While obviously not identical, none of these responses strikes us as necessarily "inconsistent" with any of the others.

founded on the *Brady*[7] doctrine, which requires a new trial when the prosecution has withheld exculpatory information from the defense. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court identified three distinct situations involving the nondisclosure of evidence by the prosecution. The first occurs when undisclosed evidence reveals that the government's case contained perjured testimony. *Id.*, 427 U.S. at 103–04, 96 S.Ct. at 2397–98, 49 L.Ed.2d at 349–350. This was the situation claimed to exist with regard to Irwin's request for a new trial on the Godfrey counts because of her alleged perjury at trial.[8] The second type of case, exemplified by *Brady* itself, occurs when the defense makes a specific request for material which is not complied with by the government. *Id.*, 427 U.S. at 104–06, 96 S.Ct. at 2398–99, 49 L.Ed.2d at 350–351. The third nondisclosure situation occurs when either a general request for all exculpatory material has been tendered by the defendant or when there has been no discovery request at all. *Id.*, 427 U.S. at 106–07, 96 S.Ct. at 2399, 49 L.Ed.2d at 351. Moreover, the *Brady* doctrine, as expounded in *Agurs*, applies even though the evidence in question relates solely to the credibility of an important government witness. *United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978).

Irwin seeks to bring himself within the second category. The district court, in granting Irwin's motion for a new trial on the Godfrey counts, found that Irwin had, prior to trial, made a specific request that encompassed the payments made to Godfrey, and that this request had not been complied with.

While the Court noted in *Agurs* that the prosecutor's failure to respond to a specific request is "seldom, if ever, excusable," *Agurs, supra*, 427 U.S. at 106, 96 S.Ct. at 2399, 49 L.Ed.2d at 351, a new trial does not automatically result. In order to obtain a new trial when a claim falls within the second *Brady-Agurs* category, the defendant must show that the suppressed evidence "might have affected the outcome of the trial." *Id.*, 427 U.S. at 104, 96 S.Ct. at 2398, 49 L.Ed.2d at 350. The small point that might be scored by questioning Hitt about his failure to reveal the untruth in Godfrey's testimony would not be sufficient either to impeach Hitt or to affect the result.

Godfrey's misstatement itself was relatively insignificant, probably unintentional, and perhaps not even heard as such by Hitt.[9] We hasten to add, of course, that we make these observations only as part of our effort to assess the probable significance the jury would have attributed to Hitt's silence in evaluating his overall credibility, which was otherwise virtually unchallenged at trial.[10]

Second, and more important, much of the evidence supporting the jury's findings of

---

7. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

8. Although Hitt was not technically part of the prosecution team and had not in fact told the prosecutor about the Godfrey payments, the district court, in granting Irwin's motion for a new trial on the Godfrey counts, imputed Hitt's knowledge to the prosecution. *See United States v. Antone*, 603 F.2d 566, 569–70 (5th Cir. 1979).

9. As noted previously, the question asked of Godfrey was as follows:

   The money that you were given [by Hitt] to buy drugs, is that the only money that was given you by any law enforcement agency any time up to the present?

   Godfrey responded, "Yes." In fact, at that time, she had been the recipient of approximately $60 to $70. Hitt testified at the post-trial hearing that this money had been given to Godfrey on three separate occasions, in approximately equal $20 amounts, some nine months before trial. Hitt stated that the money was to reimburse Godfrey for her expenses (gas, meals, etc.) in cooperating with the Irwin investigation. It is possible that Godfrey either forgot about these payments or did not consider them to be the type of payments being inquired of by Irwin's counsel; the same may also be said of Hitt.

10. Irwin attempted to challenge Hitt's credibility at only one point during trial, namely, when Hitt described Irwin's behavior during Hitt's initial investigatory visits to Irwin's pharmacy as "nervous" and only minimally cooperative.

guilt on the James counts was not dependent on its assessment of Hitt's credibility. For example, James's testimony was obviously damaging to Irwin. Moreover, one of Irwin's own witnesses, a bookkeeper at Irwin's pharmacy, testified that she "had deducted [sic] from the way [James] came in, how often he came in, the way he acted, that he probably was dealing .... Dealing drugs obviously."

Furthermore, the jury could reasonably have inferred from the prescriptions entered into evidence that Irwin knew that the Preludin prescriptions he was filling for James were not for a legitimate purpose. Irwin filled six different Preludin prescriptions for James (from four different doctors) over a three-month period for a total of more than double the amount of Preludin which could have been legitimately prescribed over that period.[11] There is no question that Irwin knew who James was, both by name and by face, since they had known each other for approximately twenty-five years, both having grown up in Tatum, Texas.

Based on this array of evidence, none of which depends upon Hitt's credibility, we cannot conclude that Irwin's inability to question Hitt about his failure to correct Godfrey's misstatement, thus possibly somewhat impeaching his credibility, "might have affected the outcome of the trial" on the James counts. We, therefore, hold that the district court did not err in denying Irwin's motion for a new trial on those counts. We turn to Irwin's direct challenges to his conviction.

### III.

It is unlawful to dispense a controlled substance except as authorized by law. 21 U.S.C. § 841(a)(1). Pharmacists are authorized to dispense controlled substances pursuant to prescription, see 21 U.S.C. § 829, but 21 C.F.R. § 1306.04(a) limits that authorization. The prescription must be issued for a legitimate medical purpose by an individual physician acting in the usual course of his professional practice. While the responsibility for the proper prescribing and dispensing of controlled substances is upon the physician, the regulation imposes a "corresponding responsibility" upon the pharmacist who fills the prescription. Thus, the regulation provides that, if an order purporting to be a prescription is not a prescription despite its appearance and, if the pharmacist knows that it was not issued in the usual course of professional treatment, both the person issuing the ostensible prescription and the person who knowingly fills it shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances. 21 C.F.R. § 1306.04(a).

In instructing the jury, the trial judge set forth these requirements, and then also detailed the requirements of other state and federal laws regarding the proper form and contents of prescriptions. The trial court apparently thought evidence showing that Irwin filled prescriptions not in proper form was relevant to the main issue in the case, whether Irwin knowingly filled prescriptions for Preludin that he knew were not for a "legitimate medical purpose," 21 C.F.R. § 1306.04(a).

Irwin argues that the inclusion of these instructions regarding the state and federal requirements impermissibly broadened, amended or altered the indictment in contravention of the fifth amendment. See *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). The crux of these arguments is that these "extraneous" instructions might have led the jury to convict him of the offenses

---

11. The six prescriptions were for a total of 214 75 milligram Preludin tablets, which were to be taken once a day, during this three-month, or approximately 100-day, period.

In addition, the information on Preludin contained in the Physician's Desk Reference, a standard treatise in the field, was read to the jury. This information indicated that "tolerance [to Preludin] usually develops within *a few weeks*. When this occurs, the recommended dose should not be exceeded in an attempt to increase anoretic [appetite-suppressant] effect. Rather, the drug should be discontinued."

charged in the indictment based upon violations of regulations not therein specified. *See, e. g., United States v. Salinas*, 654 F.2d 319, 322–25 (5th Cir. 1981) ("Salinas II"); *United States v. Ylda*, 653 F.2d 912, 913–15 (5th Cir. 1981) (on petition for rehearing and petition for rehearing en banc); *United States v. Bizzard*, 615 F.2d 1080, 1081–82 (5th Cir. 1980); *United States v. Salinas*, 601 F.2d 1279, 1288–91 (5th Cir. 1979) ("Salinas I"); *United States v. Carroll*, 582 F.2d 942, 943–45 (5th Cir. 1978).[12]

■ The trial court's instructions are not to be dissected word by word and line by line but are to be construed as a whole. *See Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973); *United States v. Brooks*, 611 F.2d 614, 619 (5th Cir. 1980). If, thus read, they might have led the jury to convict Irwin on grounds not charged in the indictment, his conviction must be reversed.

The jury charge expressly instructed that the government must prove beyond reasonable doubt three essential elements in order to establish each of the offenses charged in the indictment. It must show that the defendant distributed a controlled substance, as charged; he did so other than for a legitimate medical purpose and in the usual course of his profession; and he acted knowingly and intentionally. The court further instructed the jury that a physician who prescribes in the usual course of professional practice for a legitimate medical purpose does not, of course, commit a violation of law, nor does a pharmacist who fills such a prescription.

As the district court noted, "nothing in this key portion of the charge indicated that a technical flaw on the face of a prescription would warrant conviction." Moreover, the remainder of the charge emphasizes the crucial importance of the legitimacy of the purpose for which the controlled substance was prescribed and dispensed.

Finally, the jury was instructed: "The Defendant is not on trial for any act or conduct not alleged in the indictment." We subscribe to the district court's conclusion:

[I]t was made as clear as possible that a conviction could follow only upon a determination that the government had proven each of the elements of the offense charged beyond a reasonable doubt. The jury was directly precluded from finding the defendant guilty on the basis of any other violation of law, not charged in the indictment, which might have occurred. Taken as a whole, the charge did not authorize a conviction based upon a violation of the [state and federal requirements].

■ In the cases we have cited in which the conviction was reversed, the jury "might have" convicted the defendants on charges not included in the indictment only in the sense that the jury's instructions specifically authorized them to do so. Thus, in *United States v. Carroll, supra*, for example, the defendant was indicted for conspiracy to commit specific offenses X and Y, whereas the jury instructions specifically stated that the defendant could be convicted if he had conspired to commit offenses X, Y *or* Z. 582 F.2d at 943–44. Here, by contrast, the jury "might have" convicted Irwin for offenses not charged in the indictment only if it misunderstood the charge. Because the instructions at issue neither authorized the jury to convict Irwin for offenses not specified in the indictment, nor were so confusing as to mislead them into doing so, we consider the charge proper.

## IV.

Finally, Irwin argues that numerous prosecutorial improprieties necessitate reversal of his conviction. One of the alleged improprieties occurred during the questioning of a defense witness:

**12.** Irwin objected to the instructions on the state requirements, but failed to do so with regard to those relating to the federal requirements. Therefore, we could reverse Irwin's conviction based on the inclusion of the latter only if this constituted "plain error." *See United States v. Abravaya*, 616 F.2d 250, 251 (5th Cir. 1980); Fed.R.Crim.P. 52(b). In view of the conclusion we have reached that there was no error, the question is moot.

Q. You were subpoenaed to the federal grand jury back, oh, on May 30, 1980, were you not?

A. I was, but I couldn't tell you what day.

Q. You don't remember the exact date. You remember that subpoena, though, at the end of May?

A. Yes.

Q. You and some—how many people were up there, about eighty witnesses—testifying before the grand jury.

A. There were a lot of people.

Q. And you're familiar with the fact that this defendant and a number of other doctors and pharmacists were indicted, were they not?

Defense counsel immediately objected, and the objection was sustained.' The court instructed the jury not to consider this statement or any answer that the witness may have made. The parties thereafter stipulated to the jury that "the facts are that only one person, to-wit, John Hitt, testified before the grand jury that returned the indictment in this case."

 An instruction to disregard is sufficient, unless the remark is so highly prejudicial that it is incurable by the court's admonition. *United States v. Carillo*, 565 F.2d 1323, 1326 (5th Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1979). The facts implied by the prosecutor's question were not so prejudicial that the trial court's admonition was insufficient. The stipulation made the truth evident.

Irwin also argues that the entire trial was "riddled" with references to "preludin doctors" and "preludin pharmacists." He points to a total of fourteen such references during his five-day trial. These references were made without objection. Spread as they were over a five-day period, their admission does not constitute such plain error as to warrant reversal. Fed.R. Crim.P. 52(b).

Finally, Irwin complains that Hitt was allowed to testify "at some length" about his investigative activity relating to the prescription writing and filling practices of doctors and pharmacists throughout the East Texas area, thereby creating an impression that Irwin was "only part of a widespread and possibly related scheme or problem." The record reveals, however, that most of this testimony occurred during Hitt's cross-examination, over the *government's* objection on grounds of irrelevancy. The defendant explained at trial that he was attempting to establish the basis for a claim of "selective prosecution." Under these circumstances, even if we found Hitt's testimony prejudicial, which we do not, we would not reverse Irwin's conviction because the testimony was elicited by Irwin's counsel.

For these reasons, both the order denying Irwin's motion for a new trial on the James counts and Irwin's conviction on those counts are AFFIRMED.