Arnold L. KING, Plaintiff, Appellant,

v.

Joseph PONTE, et al., Defendants, Appellees.

No. 83–1092.

United States Court of Appeals, First Circuit.

Argued June 9, 1983.

Decided Sept. 14, 1983.

---

James S. Dittmar, Boston, Mass., with whom Richard R. Lavin, and Widett, Slater & Goldman, P.C., Boston, Mass., were on brief, for plaintiff, appellant.

Carlo A. Obligato, Asst. Atty. Gen., Criminal Bureau, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Frederick W. Riley, Asst. Atty. Gen., Chief, Criminal Bureau, and Barbara A.H. Smith, Asst. Atty. Gen., Chief, Criminal Appellate Division, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and TORRUELLA,* District Judge.

BOWNES, Circuit Judge.

In this case Arnold L. King appeals from a district court order denying his request for an evidentiary hearing and dismissing his petition for a writ of habeas corpus. King maintains that in the course of his state criminal trial the prosecutor failed to disclose exculpatory evidence in his possession and that as a result King's due process right to a fair trial was violated. Upon a close review of the record we find no due process violation and affirm the district court.

---

* Of the District of Puerto Rico, sitting by designation.

1. Just before the trial Yuhas pleaded guilty to second degree murder and this plea was ac-

## I. Facts and Proceedings Below

In 1972 King was convicted in the Massachusetts Superior Court of first degree murder and armed assault with intent to rob in connection with the shooting death of one John Labanara. He received a sentence of life in prison without eligibility for parole on the murder count and a concurrent term of eight years on the armed assault count.

In summarized form, the evidence at trial is as follows. King and two companions, Barbara Zelenka and Peter Yuhas, drove from Portsmouth, New Hampshire, to Boston late in the evening of October 19, 1971. They rode in Zelenka's 1964 Chevrolet convertible. Zelenka owned a gun which she stored, loaded, in the padding of her convertible top above the driver's head. Yuhas or King apparently took the gun while Zelenka was out of the car during a stop at a service station on the way to Boston. At around 1:30 a.m. on what was then October 20 they drove down Newbury Street in Boston and Yuhas told Zelenka to pull over and stop. Yuhas and King left the car for about three minutes, during which time they got into an argument on the street with Labanara. Labanara was shot in the head after he had gotten into his parked car and attempted to drive away. Yuhas and King then ran back to Zelenka's car and the three of them sped away and headed back to Portsmouth. Eventually King and Zelenka ended up at the latter's home in Portsmouth, arriving at about 3:00 a.m. There King gave the gun to Zelenka and Michael Vincent, who had been baby-sitting Zelenka's children, to file off its serial numbers. King then took back the gun and left several hours later.

King was tried alone and the Massachusetts Supreme Judicial Court affirmed his conviction in 1974. *Commonwealth v. King,* 366 Mass. 6, 313 N.E.2d 869 (1974).[1] The next year King filed pro se motions for the production of police department reports and

cepted. Just after the trial the Commonwealth nolle prossed a conspiracy indictment against Zelenka and filed without a change of plea an indictment for carrying a revolver.

grand jury minutes. Eventually he obtained the two pieces of evidence at issue in this appeal—minutes of Zelenka's testimony before the grand jury and notes from a police interview of Zelenka conducted within two weeks of Labanara's death while Zelenka was a patient at the Baldpate Psychiatric Clinic. King then filed a motion for a new trial in superior court alleging that these statements constituted newly discovered exculpatory evidence not disclosed at trial. After an evidentiary hearing and a thorough review of the trial transcript, the court issued a lengthy memorandum denying the motion. In relevant part it found that, based on the evidence, it was more probable than not that King's trial counsel had received the minutes of Zelenka's grand jury testimony during the trial. The court noted, however, that this factual finding had not been established beyond a reasonable doubt and thus found it prudent to assume that the prosecution had not disclosed the minutes to King's counsel during trial. The court then proceeded to analyze both the grand jury minutes and the Baldpate statement under the "general or no request" standard of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and concluded that neither statement created a reasonable doubt that did not otherwise exist. The Supreme Judicial Court affirmed the court's order without opinion.

On King's petition for habeas relief, the federal district court analyzed the grand jury minutes and the Baldpate statement in a similar fashion. Although a transcript of the hearing on the motion for a new trial was unavailable, the district court was able to satisfy itself that the state court's factual finding that King's counsel possessed the minutes during trial was supported by the record within the meaning of 28 U.S.C. § 2254(d) (1976); the district court noted that the state court had made "meticulous references" to the evidence and that many of its conclusions were based on the trial transcript, which was available for review. Thus, the district court concluded that an evidentiary hearing into the issue of whether the grand jury minutes had been dis-

closed was unnecessary. Like the state court the district court then proceeded to analyze the contents of the minutes, concluding that they were not exculpatory because they did not contradict Zelenka's trial testimony. As to the Baldpate statement, the district court concluded that it was exculpatory. Because there was no evidence that King had made a specific request for the statement the court applied the "creates a reasonable doubt that did not otherwise exist" standard of *Agurs.* It concluded that under this standard the Baldpate statement was not material and, thus, that its suppression did not violate King's right to a fair trial.

II. *Analysis*

Before we review the contents of the minutes of Zelenka's grand jury testimony and her Baldpate statement to determine whether their suppression deprived King of his due process rights we must address several preliminary issues. The first concerns whether or not King's counsel had access to the grand jury minutes during trial; if he did then King would have no basis for habeas relief stemming from a failure to disclose the minutes. *Cf. Lugo v. Munoz,* 682 F.2d 7, 9–10 (1st Cir.1982) (no constitutional violation when the information was available to the defense through diligent discovery). Next we must determine whether the district court erred in applying the "no request or general request" standard of materiality to the allegedly exculpatory pretrial statements of Zelenka. Finally, we must consider whether the district court erred in failing to consider the entire contents of the grand jury minutes and the Baldpate statement and instead limiting its review to specific excerpts within the statements. Our discussion of these matters hints at some of the confusion which has resulted from the fact that the postconviction proceedings have stretched on for years and involved numerous attorneys on both sides.

As indicated above, the state court seemed to have made a factual finding that the minutes of Zelenka's grand jury testimony were available to King's counsel dur-

ing trial and the district court seemed to have applied the statutory presumption of 28 U.S.C. § 2254(d) (1976) to affirm this finding. Upon a close reading of these court's respective memoranda, however, we are unsure whether such a factual finding was actually made. The evidence before the state court on this issue was not overwhelming. For example, King's original trial counsel testified during the hearing on the new trial motion that he did not recollect receiving Zelenka's grand jury testimony and that he would have used it if he had had it. The superior court discounted this testimony, however, because counsel also had no recollection of receiving Vincent's grand jury testimony, although the trial transcript clearly indicated that he had received it. The court's conclusion that it was more probable than not that the minutes had been disclosed was based on the inferential reasoning that facts such as the defense's receipt of Vincent's grand jury testimony made "it seem likely that Zelenka's Grand Jury testimony was furnished." This finding, however, was not so certain that the superior court was willing to rely on it solely in disposing of King's claims with respect to the minutes. Similarly, the district court was not willing to rely solely on its conclusion that the state court's findings were fairly supported by the record and instead accepted the state court's alternative reasoning for denying a new trial.

■ Given this background we cannot say that the state court made a factual finding on this issue which we should now presume to be correct under 28 U.S.C. § 2254(d) (1976). There are too many open questions with respect to the superior court's findings to dispose fairly of King's claims on that basis. We do think, however, that the district court's instincts in denying King a new evidentiary hearing on this point were on target. Although King has offered suggestions as to what his original trial counsel would testify to at such a hearing, this person had a chance to testify at the first evidentiary hearing before the state court. King has not persuaded us that a second hearing would amount to more than a replay of the first, with the actual events being blurred even more due to the passage of time. For the purpose of this opinion we think the proper approach is merely to assume that the prosecution did not disclose the minutes of Zelenka's grand jury testimony to the defense and to analyze the contents of the testimony accordingly.

■ The next issue concerns whether or not the defense specifically requested the two allegedly exculpatory pretrial statements. This issue is important because it determines which standard of materiality set out in *Agurs* is applicable. The district court found that there was no evidence in the record that the defense had made a specific request for the Baldpate statement and did not reach the question with respect to the grand jury minutes. The superior court's memorandum denying King's new trial motion, however, indicates that the defense made a request of sufficient specificity at least for the Baldpate statement. By pretrial motion King apparently made a general request for "all exculpatory evidence" but then specified that it included "all information available concerning the past and present mental condition of one 'Mrs. Zelenka.'" At a pretrial hearing, discussion centered on the Portsmouth Naval Hospital and the prosecutor denied knowledge of such a hospitalization. Although Zelenka was actually hospitalized at the Baldpate Psychiatric Clinic and not the Portsmouth Naval Hospital, this difference is immaterial. Beyond documenting the fact that she was hospitalized for a mental problem soon after Labanara's death, the notes of the police interview with Zelenka while she was at Baldpate state that she was on medication at the time and that the hospital had designated a doctor to stay with her during the interview. Clearly then the Baldpate statement fell within the defense's request for information about Zelenka's mental condition. *See Zeigler v. Callahan,* 659 F.2d 254, 267–68 (1st Cir.1981) (applying stricter *Agurs* general request materiality standard to a doctor's letter containing psychological evaluation of key prosecution witness because "petitioner's

trial counsel had never specifically requested mental records or psychological evaluations of [the witness]"). This request fulfilled the function of a specific request in that it "gave the prosecutor notice of exactly what the defense desired"; its degree of specificity contrasts with the prototypical general request asking for "*Brady* material." *Agurs,* 427 U.S. at 106–07, 96 S.Ct. at 2398–99. The minutes of Zelenka's grand jury testimony also conceivably fell within the scope of the defense's request for information concerning her mental condition because they clearly indicate that her memory may have been affected at the times she was on medication.

■ The record before us also indicates that another of King's pretrial motions amounted to a specific request for both the Baldpate statement and the grand jury minutes. In this motion King requested "copies of all statements, including co-defendants, of persons who are expected to be witnesses . . . ." This is as specific as the request reviewed in *Brady v. Maryland,* 373 U.S. 83, 84, 83 S.Ct. 1194, 1195, 10 L.Ed.2d 215 (1963) (request to examine a named accomplice's extrajudicial statements). In an affidavit attached to the motion King's trial counsel zeroed in further on the Baldpate statement when he requested statements Zelenka had made to law enforcement officers of Boston and Portsmouth— Zelenka made the Baldpate statement to a Boston officer and a New Hampshire State Police officer. It is not clear from the record before us whether there was any oral argument on this pretrial motion or whether the trial court granted the motion. Our most prudent course, therefore, is to assume that the court granted the motion and to analyze both the Baldpate statement and the grand jury minutes as though they were specifically requested. *See United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 736 (3d Cir.1978) (Evidence must be reviewed under the *Agurs* specific request standard when there is uncertainty about the request.).

Finally, before we review the Baldpate statement and the minutes we must determine what portions of them are before us. The district court applied the doctrine of procedural waiver to conclude that only one excerpt from Zelenka's grand jury testimony was properly before it. This excerpt concerned the fact that she was on medication at the time she testified and it was relatively easy for the district court to reconcile it with her statement at trial that she had in the past taken drugs when under a doctor's care but had never used drugs illegally. The district court rejected outright King's attempt to challenge other portions of the grand jury testimony. Similarly, although without explicitly relying on the doctrine of procedural waiver, the district court focused on just one portion of the Baldpate statement. The court noted that this portion, in which Zelenka said that King had seemed drugged during the drive from Portsmouth to Boston, related to King's capacity at the time to form the deliberate premeditation necessary for first degree murder. It discounted this statement, however, in light of other evidence of King's premeditation and did not review other allegedly exculpatory material within the Baldpate statement.

■ We believe that both the Baldpate statement and the grand jury minutes should be reviewed in their entirety to determine whether King's due process rights were violated. In invoking procedural waiver the district court relied upon the recent Supreme Court case of *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). In that case the procedural waiver resulted from a violation of the relevant state rule of criminal procedure requiring contemporaneous objections to jury instructions. *Id.* at 124–29, 102 S.Ct. at 1560–62. We find that the instant case is distinguishable from *Engle v. Isaac* in the important respect that the state court here had an opportunity to consider the alleged constitutional violation. *See, e.g., Kines v. Butterworth,* 669 F.2d 6, 11–12 (1st Cir.1981) (State court remedies have been exhausted when that court had an opportunity to consider and correct the constitutional defect.) (quoting *Picard v. Con-*

*nor,* 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)), *cert. denied,* 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982). King's second amended motion for a new trial clearly called into question the entire three-page Baldpate statement.[2]  In both his original motion for a new trial and his amended motion King raised the issue of the grand jury minutes being undisclosed exculpatory material.  Although these motions did indeed pinpoint the references to Zelenka taking drugs as the reason why the minutes were exculpatory, it would take strained reasoning to conclude that the minutes in their entirety were not placed in issue before the state court.[3]  The grand jury minutes were only nine pages long and it would have been highly unlikely for a court presented with King's motions not to have reviewed them in their entirety.  Indeed, the superior court's memorandum denying the new trial motion plainly shows that the court reviewed both the Baldpate statement and the grand jury minutes in their entirety; the memorandum contains a synopsis of the contents of each statement.  Under these circumstances we can properly

address King's arguments that other portions of Zelenka's grand jury testimony were exculpatory without violating the constraints of federal-state comity inherent in the doctrine of procedural waiver.

■■■■  Given our conclusion that King specifically requested both the Baldpate statement and the minutes of Zelenka's grand jury testimony, we must determine whether these suppressed pretrial statements "might have affected the outcome of the trial."  *Agurs,* 427 U.S. at 104, 92 S.Ct. at 2397.  The prosecution's failure to make any response to a specific request, either by providing the evidence to the defense or submitting the issue to the trial court is "seldom, if ever, excusable."  *Id.* at 106, 92 S.Ct. at 2398.  In attempting to give meaning to these words both the Second and Fifth Circuits have equated this standard with the lowest materiality standard set forth in *Agurs* for perjury cases.  *United States v. Provenzano,* 615 F.2d 37, 47 (2d Cir.1980), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980); *Monroe v.*

**2.**  In pertinent part this motion stated:

On August 29, 1978, in response to a subpoena, the Commonwealth provided the defendant with a copy of a statement made by Barbara Jean Zelenka to Lieutenant Detective Barry of the Boston Police Department made on November 1, 1971, at the Baldpate Psychiatric Clinic, Georgetown, Massachusetts, which statement constitutes newly discovered evidence.  The statement contradicts [sic] Zelenka's trial testimony in several material areas, is illustrative of her mental condition and use of medication, reflects on Arnold King's degree of culpability relative to his being unable to possess the requisite malice aforethought to commit murder, and thus amounts to exculpatory evidence which should have been furnished to the accused.  The failure of the Commonwealth to seasonably provide defendant's trial counsel with the statement of Barbara Jean Zelenka, of which the Commonwealth was aware and had in its possession, deprived the defendant of constitutionally guaranteed access to material evidence of his right to confront witnesses and his right to a fair trial and to due process of law . . . .

**3.**  At this juncture we are again handicapped by gaps in the record—the lack of a transcript of the hearing on these motions—caused in part

by the amount of time that has passed and the number of different attorneys involved.  Our conclusions are based solely on the motions themselves which in pertinent part are as follows:

9.  At trial the witness Zelenka testified that she never used drugs and that any drug used would kill her due to an allergy . . . .  However, at the Grand Jury, Zelenka had testified on two occasions that she was presently under the influence of drugs and was uncertain of her memory, in regards to what actually happened on October 20, 1971 . . . .

. . . .

12.  The failure of the Commonwealth to seasonably provide defendant's trial counsel with the Grand Jury testimony of Barbara Jean Zelenka, of which the Commonwealth was aware, or of which the Commonwealth should have been aware, and which testimony was totally inconsistent and in contradiction of her present trial testimony deprived the defendant of his constitutionally guaranteed access to material evidence which is favorable to the accused.  The negligent or purposeful employment of such a procedure on the part of the Commonwealth involving material evidence to the key prosecution witness's credibility and her ability to perceive and recall relevant events, deprived the defendant of a fair trial . . . .

*Blackburn,* 607 F.2d 148, 151 (5th Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980). The Fifth Circuit, for example, stated that a failure to disclose specifically requested evidence will only be excused if "there appears no reasonable likelihood that [the evidence] would have affected the judgment of the jury." *Monroe v. Blackburn,* 607 F.2d at 151 (citations omitted). Alternatively, in an earlier case we indicated that this materiality standard amounted to the normal rule of demonstrably harmless error. *United States v. DiCarlo,* 575 F.2d 952, 959 n. 5 (1st Cir.1978) (dictum), *cert. denied,* 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978). In any event, it is clear that the "might have affected the outcome" formulation does not mean that a new trial automatically results whenever the prosecution has failed, as it did here, to respond to a specific request. *United States v. Irwin,* 661 F.2d 1063, 1068 (5th Cir.1981), *cert. denied,* 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982); *see, e.g., United States v. Flaherty,* 668 F.2d 566, 588 (1st Cir.1981) (prosecutor's failure to respond excusable when undisclosed evidence was merely cumulative of evidence presented at trial to attack witness' credibility). It is also clear that we must review the Baldpate statement and the grand jury minutes in light of the evidence as a whole and consider the cumulative effect of these suppressions rather than the effect of each statement on its own. *United States ex rel. Marzeno v. Gengler,* 574 F.2d at 736–37.

It is important to note that our assessment of the record is that the evidence against King was strong and relatively evenly balanced. *See, e.g., Zeigler v. Callahan,* 659 F.2d at 262; *United States ex rel. Marzeno v. Gengler,* 574 F.2d at 736. Although Zelenka was the government's primary witness, there were several other witnesses to some of the events that occurred on Newbury Street when Labanara was shot and immediately thereafter. The testimony of these witnesses corroborated Zelenka's testimony and, considered as a whole, painted a clear picture of what happened.

One Arthur Foye was a very important witness.[4] He testified that at approximately 1:30 a.m. on October 20 he was driving down Newbury Street. While stopped at a stop sign at the intersection of Newbury and Gloucester Street he heard a shot come from behind him and to the right. He turned around and saw a white male and a black male running down the sidewalk away from a Volkswagen—which was Labanara's car—and toward Massachusetts Avenue. He then drove further along Newbury Street and continued to see the two men running crouched down. At this time he saw the black male put something in his pocket. Eventually Foye lost sight of the two men, made a right turn off of Newbury and stopped at a traffic light. He then saw a 1964–65 Chevrolet convertible pull up behind him and noticed that it had three occupants, two of whom resembled the men he had seen running. The white male was seated in the front right and the black male was in the rear seat. At this point in his testimony Foye identified King, whom he pointed out in the courtroom, as the black male he had seen. Before the traffic light changed Foye observed the two persons seated in the front of the Chevrolet change places. When the light changed Foye made a right to circle back to Newbury Street and lost sight of the other car.

The next witness was Richard Herer, a student who lived in a second floor room fronting upon an alley off Newbury Street. He testified that at about 1:30 a.m. on October 20 he had just gotten into bed to go to sleep when he heard three males arguing on the street. After about thirty seconds he heard someone walk across the street and then someone get into a car and slam the door shut. He then heard the starting of an engine of what he thought was a Volkswagen or at least a foreign car. Herer testified that he next heard the car stop and someone say "I said shoot him," followed by the sound of a gunshot. At this

---

**4.** The jury apparently agreed because during its deliberations it asked to see a portion of Foye's testimony concerning his identification of King on Newbury Street.

point he got dressed, came down to the street, and saw the stalled Volkswagen with Labanara slumped over in it.

Another witness at trial was Walter Kuliesus, a theology student who lived in a second floor room on the opposite side of Newbury Street. He testified that at about 1:30 a.m. on the same morning he saw two men running down Newbury Street toward Massachusetts Avenue. They then jumped into a Chevrolet parked on the street and the car sped off. Kuliesus was not able to tell the race of either man but estimated from their build and manner of running that they were in their teens or early twenties.

Next Zelenka testified. She said that she first met King at around 9:30 p.m. on October 19 when she was introduced to him by Yuhas, whom she had known for about three weeks. She drove the three of them from Portsmouth to Boston in her Chevrolet convertible. She had purchased a gun several days earlier for protection because she had recently been assaulted. She testified that as far as she knew the gun was where she had left it earlier, loaded and in the padding of the convertible top. The only evidence of any conversation during the trip was Zelenka's testimony that Yuhas said that he wanted to rob a drug pusher. She responded that that would be foolish and that if Yuhas wanted to take drugs it would be better to go to someone on a higher level. There was no testimony as to King saying anything on the way down to Boston.

Zelenka next testified that after they had arrived in the Boston area they drove around Cambridge under Yuhas' direction and then proceeded to Newbury Street in Boston. After stopping to ask directions from a passerby—Labanara—they then drove less than a block and Yuhas asked her to pull over and stop. Yuhas and King got out of the car and walked back while Zelenka remained in the car with the engine running. Zelenka testified that three minutes later the two men ran back to the car

with Yuhas screaming "Oh, my God, he killed him. He killed him." She said that at this time King had her revolver. Zelenka testified that as they drove off Yuhas and King got into an argument. Yuhas said, "You shouldn't have shot him." King responded, "Man, he shouldn't have give me no jive." Yuhas repeated that he should not have killed him and King answered that he had not killed him but just shot him in the shoulder. Zelenka also testified that King said "that he had killed the man, that he had got him out of his misery, that he had died happy because of his drunken state." [5] She also testified that at around this time Yuhas had said, "We tried to hold up a man and Arnie shot him," and that King said that the man had gotten in the car and ignored him.

Zelenka testified that in the midst of this conversation Yuhas took over the wheel from her at one point when they were stopped. When they arrived back in Portsmouth they dropped Yuhas off and Zelenka and King drove to Zelenka's house, arriving at around 3:00 a.m. At this point King unloaded the gun and gave it to Zelenka to file the serial numbers off it. She did so with the assistance of Michael Vincent, who was there baby-sitting her children, and returned it to King.

Vincent testified that he was at Zelenka's home that morning and identified King as the man accompanying Zelenka. He said that when they arrived King took a pistol out of his pocket and unloaded it. Vincent then recounted assisting Zelenka in filing off the numbers and returning it to King.

■ In analyzing the question of whether disclosure of the Baldpate statement and the minutes of Zelenka's grand jury testimony might have affected the outcome of this trial we first note that under Massachusetts law any prior inconsistent statements of Zelenka could have been introduced into evidence only for impeachment purposes and not as substantive proof of the stated facts. 19 Hughes, *Massachusetts*

---

**5.** Other evidence presented at trial indicated that Labanara had learned that day that he had

passed the Massachusetts bar examination and had spent the night celebrating with friends.

*Practice* § 235 (1961). Also, our review of the statements lead us to conclude that a jury would have discounted their overall worth because at both times Zelenka appears to have been on heavy medication and not very stable. During the Baldpate interview a doctor sat in with her, she received medication, and she appeared to be emotionally distraught. During her testimony before the grand jury she stated that she was on medication which tended to cloud her memory. Finally, we think both the Baldpate statement and the grand jury minutes tend to corroborate Zelenka's trial testimony when they are considered in their entirety.

King again calls into question the segment of the Baldpate statement in which Zelenka stated that "On the way down, Arnie seemed drugged and Peter was smoking." Zelenka also stated during the interview that when Yuhas ordered her to stop the car on Newbury Street he said, "Pull over, I want to get some grass." King maintains that these statements are inconsistent with the prosecution's theory of the case that he and Yuhas were engaged in a joint venture to commit armed robbery during which Labanara was shot. King contends that the statements suggest that he merely "was tagging along on an expedition to Boston to purchase drugs for personal use."

Our view of the prosecution's joint venture theory differs somewhat from King's. Both the evidence presented and the prosecutor's closing argument show that the joint robbery venture alleged was one that occurred in the short period of time during which the events on Newbury Street took place, not a joint venture which commenced in Portsmouth and was carried out in Boston. For example, there was practically no evidence presented concerning King's activity before he got out of the car with Yuhas. Therefore, the fact that he seemed drugged on the way down to Boston would have had little impact on his defense because it said nothing about the events that transpired around the time of the shooting. Similarly, any doubt that this fact might have cast on King's ability to premeditate would have

paled in comparison to the evidence of rational thinking during the minutes before and after the shooting—this included evidence that he ran crouched down back to the car and put something into his pocket and that he argued about and admitted the shooting when in the car. King's ordering Zelenka and Vincent to file off the gun's serial numbers also evidenced a mental state capable of premeditating murder and rationally taking steps to avoid being caught. King's claimed drug condition vanished as soon as he put a bullet in Labanara's head.

■ Finally, the use that King is attempting to make of Zelenka's pretrial statements is totally inconsistent with the defense's strategy at trial. This strategy was limited to attacking the credibility of the witnesses to show that they were fabricating a story to protect themselves and to suggest that in actuality King was not part of the excursion to Boston nor present on Newbury Street at the time of the shooting. We recognize that a court should be wary of binding the defense to a course chosen at trial in a vacuum created by the state's failure to disclose evidence. *Scurr v. Nicum,* 620 F.2d 186, 189 n. 3 (8th Cir.1980). In this case, however, we do not think such a vacuum was created. The defense had ample opportunity at trial to pursue the theory, through Zelenka, that King was merely on an expedition to obtain drugs or that he was too drugged at the time to premeditate. Given the circumstances surrounding King's trip to Boston, we cannot imagine that the Baldpate statement could have suggested a new theory to King's experienced trial counsel that he had not already considered and rejected. Thus, we find that the disclosure of the pretrial statements would not have affected the outcome of the trial. *See United States v. Provenzano,* 615 F.2d at 48–51 (concluding that suppressed evidence was not material under the specific request standard because the court was satisfied that the defense never would have used the evidence to impeach the witness but would have stayed with its original trial strategy of not cross-examining the witness).

Next, King points to a segment of Zelenka's grand jury testimony which allegedly conflicts with her trial testimony that after Yuhas and King returned to the car Yuhas said that they had tried to hold up the man and that Arnie had shot him. Specifically, King points to the following line of questioning before the grand jury:

Q. Was there talk he tried to hold them up?

A. No talk about that.

Q. Do you remember talking to Michael Vincent?

A. After I got home.

Q. Do you remember telling him that?

A. That is what they were doing. There was no discussion of it afterward.

This colloquy, however, can only be understood when read in its full context:

Q. Any talk after you had swapped and Peter [Yuhas] was driving about what happened on Newbury St.?

A. They had a row about it. Arny [sic] was pleased with himself. That is the way he seemed. Peter was upset about it. Peter said there was no need of killing the guy and really there was not.

Q. Did they say they tried to hold the man up he ignored them got in his car and Arny [sic] shot him?

A. Peter said you should not have shot him he was too drunk to stand up. He was like me scared and upset.

Q. Was there talk he tried to hold them up?

A. No talk about that.

Q. Do you remember talking to Michael Vincent?

A. After I got home.

Q. Do you remember telling him that?

A. That is what they were doing. There was no discussion of it afterward.

Q. You knew they were going to hold him up.

A. I did not know it before they did it.

Q. You knew after they got back in the car they said they tried to hold him up.

A. Yes. I was like in a state of shock then. I am heavy on drugs now and maybe something I said then I would not remember now.

This more complete excerpt shows that Zelenka was not completely coherent when she testified before the grand jury. Even so, her testimony does tend to corroborate her trial testimony as to what took place in the car after King and Yuhas had returned. We conclude that this testimony does not cast enough doubt on Zelenka's trial testimony or on the other evidence to enable us to find that it might have affected a jury determination that King intended to rob the victim whom he shot.

King also points to a statement by Zelenka during the Baldpate interview that she did not see a gun; and argues that this raises doubts about her trial testimony that King had her revolver when they returned to the car. The role of Zelenka's testimony here is important because during the closing arguments the prosecutor highlighted her statement that King had the gun at this time. Because Zelenka's Baldpate statement could only have been used for impeachment purposes we think it best to consider whether it might have affected the outcome by assuming that it would have cancelled out completely the probative value of her trial testimony on this point. We find that there was other evidence sufficient to support the conclusion that King had the gun. This evidence included Foye's testimony that King put something in his pocket while running back to the car, Vincent's testimony that King had the gun when they arrived at Zelenka's home, and Zelenka's testimony about the conversation in the car immediately after the shooting.

Finally, King argues that both the grand jury minutes and the Baldpate statement were material for the purpose of generally impeaching Zelenka. Our review of the record, however, shows an abundance of evidence before the jury to impeach her. The jury received a rather clear picture of Zelenka as a totally irresponsible person. She had picked up a hitchhiker, Michael Vincent, an AWOL soldier in his late teens, at 2:00 a.m. one night several days before the murder and brought him home. She let him remain at her house as a live-in baby-sitter for her three young children. During

trial she was never able to provide a totally rational explanation of why she drove Yuhas and King to Boston. The defense cross-examined her on this repeatedly and emphasized it during closing argument. The jury also learned that she was under indictment for her role in this affair and that she had spent more than two months in a mental institution immediately after the murder. The cumulative nature of any evidence offered to impeach Zelenka plays a major role in our analysis of the grand jury minutes and the Baldpate statement as a whole. *See, e.g., Zeigler v. Callahan,* 659 F.2d at 266 (Even when a specific request has been made, courts will reject the notion that evidence to impeach a key government witness is material when it is merely cumulative and the defense has had opportunities to impeach that witness by other means.).

The district court's order denying an evidentiary hearing and dismissing the petition for a writ of habeas corpus is thus affirmed.

*Affirmed.*